Cheryl JENNINGS, Appellant,

v.

**STATION CASINO ST. CHARLES, and Missouri State Treasurer, Custodian of the Second Injury Fund, Respondents.**

No. ED 86771.

Missouri Court of Appeals,
Eastern District,
Division Four.

April 25, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 1, 2006.

Application for Transfer Denied
Aug. 22, 2006.

Dean L. Christianson, St. Louis, MO, for appellant.

Mary Ann Lindsey, Jeremiah W. (Jay) Nixon, Atty. Gen., Barbara L. Toepke, Asst. Atty. General, St. Louis, MO, for respondent.

ROBERT G. DOWD, JR., Judge.

Cheryl Jennings (Claimant) appeals from the final award of the Labor and Industrial Relations Commission (Commission) affirming the award of the Administrative Law Judge (ALJ) denying Claimant's claim for permanent total disability benefits and for certain past and future medical care against Station Casino St. Charles (Employer). On appeal, Claimant argues the Commission erred in denying payment of past and future medical bills related to the discogram based on the finding that Claimant's discogram was not causally related to her work injury, and in denying Claimant permanent total disability benefits and temporary total disability benefits. We reverse and remand.

Claimant worked for Employer from approximately 1994 to 1997 as a cocktail server. She was injured on September 16, 1997 when she was on Employer's premises, walking along a concrete sidewalk to her job site. There was an uneven area of concrete, and as she moved to avoid an approaching tractor she tripped and fell to the ground. In so doing she struck the left side of her body and scratched her left elbow.

Throughout the day as she worked, Claimant's symptoms worsened. On the next day she sought medical treatment from her family physician who examined

her, prescribed medication, and advised her to stay off work. Several days later, Claimant went to the emergency room where she stated her back complaints were not improving and that she was having difficulty getting out of bed. She was evaluated, x-rayed, given a shot of a "pain reliever," and advised to stay off work.

Within a few days, Claimant returned to the emergency room. She was again x-rayed and given medication. On that same day she returned to Employer's premises in an attempt to return to work, but Employer advised her that she first needed further evaluation. Claimant was evaluated on September 23, 1997, but she was not provided with medical care. Instead she was referred to St. John's Mercy Medical Center and admitted to the hospital. During her two-day admission, Claimant received medical care for her back and also for depression related to problems in her personal life.[1],[2]

Eventually Employer sent Claimant for an examination to two doctors neither of whom provided her with medical treatment. She had continuing symptoms which did not improve, and which included a stabbing pain in her lower back with pain and numbness in both of her legs. Sometimes she missed work because of her complaints, stating that if she had to do a great deal of standing or walking she would have complaints of such severity that she would have to lie in bed for a couple of days to recover. Because of her ongoing complaints, Claimant returned to her family physician who treated her with physical therapy and medications. Much of this medical care was paid for by Employer and Insurer. Claimant continued treating with her family physician over the next four years.

Throughout this period, Claimant was also seen by Dr. David Volarich, who is board certified in nuclear medicine, occupational medicine, and as an independent medical examiner.[3] Dr. Volarich evaluated Claimant's condition but did not provide treatment. In March 2000, Claimant saw Dr. Heidi Prather in the Department of Orthopedic Surgery at Washington University, where she received epidural steroid injections, physical therapy and medication. The treatment provided her with no long-term relief and therefore in June 2001, Claimant saw Dr. Matthew Gornet, an orthopedic surgeon, who proposed additional testing including a discogram.[4] In concluding that a discogram was medically necessary, Dr. Gornet stated that Claimant exhibited "classic offending lesion of discogenic low back pain" based on Claimant's subjective complaints as well as the anatomic findings seen on the MRI. Claimant stated she was interested in proceeding with this treatment in order to find relief from her chronic pain.

Employer disputed the recommendations of Dr. Gornet, and a temporary award hearing was held on November 28, 2001. On March 4, 2002, the ALJ issued a Temporary or Partial Award finding that

---

1. Claimant testified that in August 1997 she had been assaulted by her boyfriend, who struck her in the right eye with his fist. She stated she had not been knocked or pushed down, or injured her back or legs as a result of this incident.

2. Claimant filed her claim for compensation on October 21, 1997, alleging injury while at work. Employer initially denied Claimant had suffered a work-related injury but eventu-

ally admitted on November 28, 2001, during the temporary award hearing, that the injury was compensable.

3. Claimant saw Dr. Volarich at the direction of her attorney.

4. A discogram involves placing a needle into a vertebral disc and inserting a fluid to determine if the disc has a tear.

Claimant's work accident caused the need for additional medical treatment, and specifically found that the discogram which Dr. Gornet had recommended was medically causally related to Claimant's accident and ordered that "Employer is responsible for providing Claimant with a discogram and such additional care as may be recommended thereafter."

Following the temporary award, Dr. Gornet performed the discogram on April 23, 2002. Several days after the discogram, Claimant felt she could not get out of bed or walk because of pain in her lower back where the discogram was done. She went to the emergency room where she was given pain medication. Her complaints continued so she returned to see Dr. Gornet. He ordered an MRI, which revealed discitis (disc space infection). Claimant was re-admitted to the hospital, where her infection was treated with intravenous antibiotics. Claimant eventually had two surgeries, one in June 2002 and another in September 2002 as a result of the infection. The second surgery was a fusion of the spine.

Since September 2003, Claimant has continued to receive treatment for back and leg complaints from her family physician. She continues to see her family physician about once per month for pain medications. She has also gone to the emergency room about five times because her back and legs hurt. Claimant testified she was feeling quite a bit worse since the temporary award hearing. She has pain in her back and numbness in her legs. She said she has back symptoms almost every day. She has trouble sleeping more than five or six hours at night. She can lie back in a recliner but cannot lie on her stomach at all, and must put a pillow between her knees. The numbness in her legs is constant and some days she stays in bed because she cannot walk. The medications she takes give her problems with concentration. Even without the medication she feels depressed and anxious every day. She has trouble with most activities and now lives with her mother. She can drive comfortably for 15 to 20 minutes and can stand for about half an hour. She can sit for about 15 minutes before having to lie down. She is unable to walk more than around the block because of pain. If she tries to do more activity, she has pain in her low back and then has to rest for a day or two.

On July 8, 2004, a different ALJ held a hearing on the Claim for the final award.[5] In the final award, issued on December 7, 2004, the ALJ held that Claimant sustained a 30 percent permanent partial disability of the body as a whole, referable to the lumbar spine, as a result of the September 16, 1997 accident. The ALJ ruled that the Second Injury Fund was liable for 20 percent permanent partial disability of the body as a whole, due to the synergistic effect between Claimant's preexisting psychiatric disability and her work related back injury. The ALJ denied Claimant's request for past medical expenses relating to the discogram, holding that the evidence did not establish a causal link between the work accident and injury and the discogram and complications arising from that procedure. While the ALJ awarded Claimant future medical care arising from the work accident, she denied Claimant's request for future medical treatment related to the discogram, infection, and fusion surgery. The ALJ further found that in view of her ruling that the discogram was not medically causally related to the work

---

5. The ALJ at the temporary award hearing was the Honorable Jo Ann Karll. Judge Karll subsequently retired from the bench, and the final award hearing was conducted by the Honorable Leslie E.H. Brown.

accident, the additional disability which resulted from the performance of the discogram, was not to be taken into consideration in determining the nature and extent of Claimant's current disability.

Claimant appealed to the Commission. The Commission issued its final award allowing compensation awarded by the ALJ's final award and holding that the ALJ's final award was supported by competent and substantial evidence. Claimant now appeals.[6]

We review the award of the Commission pursuant to Section 287.495, RSMo 2000.[7] *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222 (Mo. banc 2003). Under Section 287.495, we may modify, reverse, remand for hearing, or set aside the award only if: 1) the Commission acted in excess of its powers; 2) the award was procured by fraud; 3) the facts found by the Commission do not support the award; or 4) there was not sufficient, competent evidence in the record to warrant the making

of the award. Section 287.495.1; *Hampton,* 121 S.W.3d at 222.

We examine the whole record to determine if it contains sufficient, competent and substantial evidence to support the award. *Hampton,* 121 S.W.3d at 222–223. We will set aside the Commission's award if it is contrary to the overwhelming weight of the evidence. *Id.* An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence. *Id.*[8]

In her first point, Claimant argues the Commission erred in finding that Claimant's discogram was not causally related to her work injury. Specifically, Claimant contends that the discogram, which was determined by the ALJ after the temporary award hearing to be a medically necessary procedure, aggravated her original work-related injury. We agree.

---

6. Employer argues Claimant failed to raise her arguments before the Commission. Consequently, Employer urges this Court to disregard Claimant's arguments as she has failed to preserve them for appellate review. *Donovan v. Temporary Help,* 54 S.W.3d 718, 719 (Mo.App. E.D.2001). However, a review of Claimant's application for review before the Commission reveals Claimant specifically raised the issues of medical causation, past and future medical bills, as well as permanent total disability. *See* Arguments I, III, IV, and V of Exhibit A.

7. Unless otherwise indicated, all further statutory references are to RSMo 2000.

8. Claimant argues that the Rule of Necessity applies in this case because Commissioner William Ringer, a former partner with Evans & Dixon, which was representing Employer, voted in order to create the two-to-one majority in favor of Employer. Commissioner Ringer himself noted in his concurring opinion that "pursuant to the rule of necessity, I am compelled to participate in this case as

there is no other mechanism in place to resolve the issues in the claim." Claimant urges us, therefore, to review Claimant's case with "special intensity." The Rule of Necessity is a doctrine that allows a person to be a judge in a case in which he has an interest where there is no other mechanism for a substitute judge. *Barker v. Secretary of State's Office,* 752 S.W.2d 437, 439 (Mo.App. W.D. 1988). In *Barker,* a member of the Commission had served as counsel for the employer and the insurer in a case involving a worker's compensation claim. *Id.* In *Barker,* the Commissioner disqualified herself from participation, and did not participate in the case until the other two commissioners had reached a stalemate. *Id.* The court in *Barker* held that the Rule of Necessity applied and that the Commission's decision needed to be reviewed with "special intensity." *Id.* at 441. However, the *Barker* court recognized the scope of review on appeal was still governed by Section 287.495.1, but added that the record should "be thoroughly examined to determine if any injustice has been done ... given the circumstances present." *Id.*

██ The purpose of Workers' Compensation Law is to "place upon industry the losses sustained by employees resulting from injuries arising out of and in the course of employment and, consequently, the law should be liberally construed so as to effectuate its purpose and humane design." *Rogers v. Pacesetter Corp.*, 972 S.W.2d 540, 542–43 (Mo.App. E.D.1998). Therefore, "[a]ny question as to the right of an employee to compensation must be resolved in favor of the injured employee." *Id.* at 543.

██ In Missouri, where the primary injury is aggravated by medical treatment, without fault of the employee, there is a causal connection between the original injury and the resulting disability. *Wilson,* 403 S.W.2d at 958. Employers have an unqualified and absolute duty to provide medical treatment to its injured workers. *Id.* at 957.

In rejecting Claimant's medical causation argument, the Commission found that Claimant's infection, surgery, and heightened disability were not directly traceable to Claimant's work accident nor did they flow from the back injury arising out of that work event. Instead, the Commission concluded that the performance of the discogram constituted an independent, intervening cause that served to break the chain of causation between the original back injury resulting from the September 1997 accident and the new injury Claimant sustained. The Commission based its finding in part on the testimony of Dr. Volarich who stated that absent the discogram, there would be no discitis, no erosion of the bone, no need for fusion surgery, and

no increase in Claimant's level of disability. The Commission stated in its final award that it found Dr. Volarich's testimony on the issue of the cause of Claimant's back problems to be credible.

Here, the evidence supports a finding that Claimant's original work-related injury was aggravated by the medical treatment she received when she developed an infection from the discogram, which was "reasonably ... required ... to cure and relieve from the effects" of the September 16, 1997 work-related injury. Section 287.140.1. In *Wilson v. Emery Bird Thayer Company,* 403 S.W.2d 953, 958 (Mo.App.1966) held that a causal connection exists between the original injury and the resulting disability where, without any intentional conduct on the part of employee, the original injury is aggravated by medical treatment. In *Wilson* the employee had fallen and injured her arm, neck and shoulder in a compensable workers' compensation accident. *Id.* at 955. Treatment of these injuries included being placed in traction, which in turn caused an injury to her jaw. *Id.* The employer's doctors discharged her, without treatment of her jaw, and thereafter the insurer "cut off all medical treatment." *Id.* The employee therefore sought treatment for her jaw on her own, and she eventually received an award which found the employer and insurer liable for both the costs of the medical treatment and the increased disability. *Id.* at 956–957.

The *Wilson* court acknowledged that Section 287.140 holds an employer to a duty to provide medical care.[9] The *Wilson*

---

9. At the time of employee's injury in *Wilson,* that section read:

[i]n addition to all other compensation, the employee shall receive and the employer shall provide such medical, surgical, chiropractic, and hospital treatment, including nursing, custodial, ambulance and medi-

cines, as may reasonably be required after the injury or disability, to cure and relieve from the effects of the injury. If the employee desires, he shall have the right to select his own physician, surgeon, or other such requirement at his own expense.

court reasoned that "[t]he duty of the employer to provide treatments so required by statute is unqualified and absolute," which means that if the employer and insurer refuse or neglect to provide or tender necessary medical treatment, the employee need not lie helpless or in pain, but may procure necessary aid and have an award issued against the employer. *Id.* at 957. While the *Wilson* court acknowledged that "injuries which follow as legitimate consequences of the original accident are compensable, and such accident need not have been the sole or direct cause of the condition complained of," it also stressed that there are limits on what may be deemed to be "causally connected" to the injury. *Id.* at 958. Similar to the *Wilson* court, we consider the entire record to determine whether the discogram, which caused Claimant's infection and which eventually led to additional medical treatment and disability, was a "legitimate consequence" of and "causally connected" to Claimant's fall on September 16, 1997. In making this determination, however, it is important to note that even though the discogram produced a debilitating infection, this is irrelevant to the issue of whether the procedure was reasonably indicated by the medical evidence at the time it was recommended.

▮▮▮▮ As mentioned above, there were two proceedings in this matter—first at a hearing for a temporary award and second at a hearing for a final award. It is well-settled in Missouri that findings and conclusions made by an ALJ in a temporary award are not binding on any subsequent proceeding. *See Dilallo v. City of Maryland Heights,* 996 S.W.2d 675, 676 (Mo. App. E.D.1999)(holding that the temporary award of the ALJ, which found that injury to claimant's lower back was not compensable under the Workers' Compensation Act, was not res judicata on the issue of medical causation). Furthermore, the language of Section 287.510 recognizes that the final award may not be in accordance with the temporary or partial award.[10] *Welch v. Eastwind Care Center,* 890 S.W.2d 395, 398 (Mo.App. W.D.1995). The legislature clearly contemplated that the ALJ may render a decision in a final hearing which differed from that of the temporary or final award. *Id.*[11] Even so, to modify a temporary award, the ALJ in the final award must find there was "additional significant evidence" not before the ALJ at the temporary award. *Dilallo,* 996 S.W.2d at 676.

Here, at the final award, no new evidence was admitted to show Claimant was not in need of further treatment, as was determined at the temporary award hearing. The evidence showed that from the time of the accident until the time the discogram was performed, Claimant suffered from chronic lower back pain that was treated only with physical therapy and medication. While Claimant's symptoms would improve to some degree with such treatment, they would inevitably return.

---

The wording of Section 287.140 changed after the issuance of the *Wilson* decision, though such change did not alter the employer's duty to provide care.

**10.** Section 287.510 states in pertinent part as follows:

In any case a temporary or partial award of compensation may be made, and the same may be modified from time to time to meet the needs of the case, and the same may be kept open until a final award can be made. . . .

**11.** In order to further the intent of the legislature to provide for a remedy when there are disputed issues over the need for medical treatment, it is clear the Commission must review the temporary award based on the evidence that was before the ALJ at the time of the temporary award hearing.

Her symptoms eventually progressed to a stabbing pain in her lower back with pain and numbness in both of her legs which prevented her from sustaining long term employment. Claimant eventually sought treatment from the Department of Orthopedic Surgery at Washington University and was eventually referred for a surgical recommendation to Dr. Gornet.

Employer disputed that Claimant was in need of any additional medical care and therefore Claimant saw Dr. Gornet on her own on June 28, 2001. Dr. Gornet reviewed the MRI scans and said the films showed what appeared to be a weakening or tearing of the annulus. Because of this, he recommended that Claimant undergo a discogram, in which he would place a needle in the disc and inject a fluid to determine if a tear is present. Claimant was interested in proceeding with the discogram and had her case set for a temporary award hearing on November 28, 2001, at which time she sought a temporary award for such further treatment as she may need. On March 4, 2002, the ALJ issued her temporary award ordering that the discogram be performed.

Dr. Gornet performed the discogram, but several days later Claimant's lower back pain became worse. She was readmitted to the hospital, at which time it was found that an infection had developed. Even after extensive antibiotic treatment, Claimant's infection eventually resulted in the need for two surgical procedures, and Claimant has been unable to return to work since.

The crux of the debate between Claimant and Employer regarding the need for the discogram revolves around the testimony of Dr. Volarich. In his deposition in March 2004, Dr. Volarich testified as follows with regard to whether the September 1997 work accident caused the need for the discogram:

Q: At least as you saw it, as of 5/15/98 and 9/7/99, the incident at work didn't even cause a need for a diskogram?

A: At that point, I didn't think anything was needed. Again, I didn't see her at the time Dr. Gornet did again to see what change in her symptoms had occurred. You know, that's one of the next steps in the diagnostic process. *When a patient still has back pain radiating into the leg with an MRI, for example, that doesn't show an obvious frank herniation, the diskogram is a very specific test for that level.*

[Emphasis added.]

Dr. Volarich evaluated Claimant on three separate occasions—in May 1998, September 1999, and November 2003. After the May 1998 evaluation, Dr. Volarich diagnosed Claimant with small disc herniations at L-4–5 and L5–S1 causing lower extremity radiculopathy. While Dr. Volarich stated Claimant had reached maximum medical improvement, he also testified that Claimant would require ongoing intermittent treatment with anti-inflammatory medications, pain pills, physical therapy and "other similar treatments for symptomatic relief." At the temporary award hearing, Dr. Volarich also recommended a trial of epidural steroid injections to potentially alleviate Claimant's pain. If these attempts at pain relief failed, Dr. Volarich recommended additional diagnostic testing in the form of a myelogram and postmyelogram CT.

In his testimony at the time of the temporary award hearing, Dr. Volarich did not specifically recommend a discogram. However, he testified unequivocally that Claimant was in need of further medical treatment to relieve her pain and that additional diagnostic studies would be necessary if these attempts proved unsuccessful. After the September 1999 evaluation,

his diagnosis remained essentially the same. After the November 2003 evaluation, however, Dr. Volarich concluded that as a result of the diagnostic discogram, Claimant developed discitis at L4–5 that progressed to osteomyelitis (bone infection) and resulted in the subsequent surgeries.

Employer argues that Dr. Volarich did not recommend hearing a discogram at the time of the temporary award and it was Dr. Volarich's opinion that the discogram was neither reasonable nor medically necessary to treat Claimant's work-related injury. While it is true that Dr. Volarich had not specifically proposed a discogram at the time of the temporary award hearing, he did testify that Claimant was in need of further treatment, and he specifically testified that if the pain relief he recommended, including epidural steroid injections, would prove unsuccessful, Claimant would require additional diagnostic studies, in the form of a myelogram with post-myelogram CT.

The overwhelming weight of the competent and substantial evidence that was before the ALJ at the time of the temporary award hearing was that Claimant was in need of further medical treatment at that time, and that a diagnostic study, whether in the form of a discogram or a myelogram with post-myelogram CT, was a reasonable course of treatment.

At Dr. Volarich's second deposition, which was in evidence at the time of the final award hearing, he was specifically questioned about the need for the discogram. Dr. Volarich conceded that if he had known in 1998 and 1999 what Dr. Gornet knew in 2001 about Claimant's condition, he too would have recommended a discogram.

The overwhelming weight of the competent and substantial evidence reveals that Claimant's discogram and resulting infection were a natural and legitimate consequence of her fall at work on September 16, 1997. The testimony from Dr. Volarich's second deposition reveals that the Commission erred in failing to find Claimant's injuries stemming from the discogram were not causally connected to Claimant's work injury. *Dilallo*, 996 S.W.2d at 676. Dr. Volarich stated in his second deposition that he had not been able to observe Claimant's change in symptoms, as had Dr. Gornet, because he had not examined Claimant for over four years. However, he conceded that a discogram is one of the next steps in the diagnostic process when a patient, like Claimant, continues to have back pain radiating into the leg.

Modification of a temporary award requires "additional significant evidence" not before the ALJ at the time of the original award. *Dilallo*, 996 S.W.2d at 677. Here, at the time the temporary award was issued, the overwhelming weight of the competent and substantial evidence indicated that Claimant was in need of further medical treatment, either in the form of a discogram, a myelogram, or epidural steroid injections. Only Dr. John Wagner testified that Claimant was not in need of *any* treatment and suffered no permanent partial disability.[12] Dr. Wagner, who saw Claimant on behalf of Employer, stated that after examining Claimant he found only "a slight increase in the lumbar lordosis. Otherwise his examination was normal." Dr. Wagner concluded that Claimant was capable of working without need for further medical care. Dr. Wagner's

---

12. The record reveals that Claimant sought and, in many cases, received care from physicians at St. Joseph's Hospital, Barnes–Jewish St. Peters Hospital, St. John's Mercy Medical Center, as well as family physicians.

testimony was contradicted by the testimony of Dr. Gornet, Dr. Volarich and the testimony of Claimant herself regarding Claimant's ongoing pain and the failure of the treatments to relieve her symptoms.

In modifying the temporary award, the ALJ stated in the final award that "additional significant evidence has been presented and will be considered on the issue of medical causation."[13] However, a review of the record reveals that no "additional significant evidence" was before the ALJ at the time the final award was rendered. Dr. Gornet reiterated his belief that a discogram was a reasonable course of treatment and Dr. Volarich eventually concurred with Dr. Gornet's opinion based on Claimant's condition as of June 2001. Similarly, Dr. Wagner's opinion remained unchanged that Claimant did not need any treatment and had no permanent partial disability from the work-related injury. The overwhelming weight of the competent and substantial evidence shows that at the time the ALJ issued the temporary award, the discogram was medically necessary to cure and relieve the effects of the September 16, 1997 work-related injury. That the discogram ultimately resulted in an infection and disability is not new evidence on the question of whether Claimant was in need of such treatment or on the question of whether the need for such treatment was medically causally related to the original injury.

The decision of the Commission's majority is reversed. This matter is remanded back to the Commission with instructions that an award be entered which finds that the discogram, and its sequelae, are medically causally connected with the injury which occurred on September 16, 1997. In light of this finding, the Commission is instructed to reconsider the issue of whether Claimant is entitled to reimbursement for past and future medical expenses related to the discogram. Further, the Commission is instructed to reconsider the nature and extent of Claimant's disability including whether Claimant is eligible to receive temporary total disability benefits and whether Claimant is permanently and totally disabled. As such we need not address these issues in this opinion.

NANNETTE A. BAKER, P.J., and SHERRI B. SULLIVAN, J., concur.

---

13. In making this finding, the ALJ cited to *Dilallo,* 996 S.W.2d at 677.