

# In the
# Missouri Court of Appeals
## Western District

JEFFERSON CITY COUNTRY )
CLUB, )
)    **WD79405**
        **Appellant,** )
)    **OPINION FILED:**
v. )    **September 27, 2016**
)
LYDIA PACE AND TREASURER OF )
THE STATE OF MISSOURI, )
CUSTODIAN OF THE SECOND )
INJURY FUND, )
)
        **Respondents.**

**Appeal from the Labor and Industrial Relations Commission**

Before Division Two:  Karen King Mitchell, Presiding Judge, Cynthia L. Martin, Judge
and Gary D. Witt, Judge

Jefferson City Country Club ("Employer") appeals the unanimous Final Award of

the Labor and Industrial Relations Commission (the "Commission"), which awarded Lydia

Pace ("Pace") certain worker's compensation benefits arising out of injuries she sustained

while working for Employer.  Employer raises eleven claims of error.  We affirm.

## Factual Background

On October 4, 2002, Pace was employed by Employer as a waitress, bartender, and banquet worker. As she was breaking down some tables for Employer, five to six table toppers fell on her, throwing her back into another table and injuring her neck and right shoulder. Immediately following her injury, Pace consulted a number of doctors regarding her neck and shoulder and was referred to physical therapy and prescribed pain medications. Eventually, Pace was referred to a Dr. Timothy Graven ("Dr. Graven"), who, in August of 2004, performed surgery on Pace's neck. Following the operation, Pace was referred back to a previous doctor, Dr. Theodore Rummel ("Dr. Rummel"), for an operation on Pace's right shoulder. Pace was released from treatment by Dr. Rummel on November 17, 2005. All treatment for Pace's neck and right shoulder and temporary total disability ("TTD") resulting from these injuries until November 17, 2005 were authorized and paid for as a worker's compensation benefit by Employer.

Following her release from treatment, Pace continued to suffer from shooting pain in her neck and down from her right shoulder. She also experienced numbness and cold down her arm to her right index finger. Further, she was diagnosed with depression. For a short period, Pace worked part-time at a restaurant carrying trays, but experienced increased pain when working and was fired from the job. Pace also worked for a short time for a kitchen setting out plates. Pace saw numerous doctors seeking treatment and disability opinions as to her condition between her release from treatment in November of 2005 and a hearing on temporary benefits by the Division of Workers' Compensation in

2

2010. A hearing was held and a Temporary Award was issued regarding the extent to which Pace was entitled to temporary benefits on November 30, 2010.

Following the Temporary Award, Pace again underwent surgery on her neck performed by Dr. Michael Chabot ("Dr. Chabot"). Dr. Chabot performed a two level fusion. Following surgery, Pace reported having decreased neck pain but ongoing right shoulder pain that was exacerbated by any kind of repetitive movement.

The parties stipulated that Pace sustained a compensable work-related injury on or about October 4, 2002, while working for Employer. They also stipulated that Pace timely notified Employer of the injury and timely filed a claim. Further, they stipulated as to the rate of compensation, the amount previously paid for TTD, and medical care. It was also stipulated that Pace achieved Maximum Medical Improvement ("MMI") on August 25, 2011.

A final hearing was conducted and the Final Award was issued by an ALJ with the Division of Workers' Compensation in July of 2015 ("July 2015 Decision"). After an appeal to the Commission, the findings of the ALJ's July 2015 Decision were unanimously adopted but modified in two respects by the Commission: (1) the Commission supplemented the award to provide necessary analysis regarding causation between Pace's work-related injury and her depression; and (2) the Commission granted TTD for a longer duration than had been granted by the ALJ. As modified, the final decision found the following with regard to Pace's entitlement to benefits:

(1) Pace sustained her burden of proof that she injured her neck and right shoulder in the October 4, 2002 accident at work;

3

(2) Pace sustained her burden of proof that she is permanently and totally disabled ("PTD") as the result of her neck and right shoulder injuries coupled with her depressive symptoms;

(3) Pace failed to prove Second Injury Fund liability as there was no evidence of permanent disability preceding the October 4, 2002 accident and injury;

(4) Pace sustained her burden of proof that she is entitled to past temporary disability benefits from November 17, 2005 through August 24, 2011;[1] and

(5) Pace sustained her burden of proof that she is entitled to future medical treatment to treat her neck and right shoulder pain, as well as her depression.

Employer now appeals. Additional facts will be presented as necessary in the analysis section below.

## Standard of Review

"We ... review the findings and award of the Commission rather than those of the ALJ, to the extent that it departs from the ALJ's ruling." [*Small v. Red Simpson, Inc*., 484 S.W.3d 341, 344 (Mo. App. W.D. 2015).] "To the extent that the Commission affirms and adopts the ALJ's findings and conclusions, we review the ALJ's findings and conclusions." *Id*. We may modify, reverse, remand for rehearing, or set aside the award of the Commission only if we determine that the Commission acted without or in excess of its powers, that the award was procured by fraud, that the facts found by the Commission do not support the award, or that there was not sufficient competent evidence to warrant making the award. Section 287.495.1

"We review the whole record to determine whether there is sufficient competent and substantial evidence to support the award or if the award is contrary to the overwhelming weight of the evidence." *Gleason v. Treasurer of State of Missouri–Custodian of Second Injury Fund*, 455 S.W.3d 494, 497 (Mo. App. W.D. 2015) (internal citation omitted). "This Court defers to the

---

[1] The July 2015 Decision found that Pace was entitled to TTD benefits from January 3, 2011. This finding was modified by the Commission to find that Pace was entitled to TTD benefits from November 17, 2005 through August 24, 2011.

4

Commission's factual findings and recognizes that it is the Commission's function to determine credibility of witnesses." *Riley v. City of Liberty*, 404 S.W.3d 434, 439 (Mo. App. W.D. 2013) (quoting *Hornbeck v. Spectra Painting, Inc*., 370 S.W.3d 624, 629 (Mo. banc 2012)). "This Court may not substitute its judgment on the evidence, and when the evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding." *Riley*, 404 S.W.3d at 439. "The Commission's determinations of law, however, are reviewed independently." *Gleason*, 455 S.W.3d at 497.

*Lincoln Univ. v. Narens*, 485 S.W.3d 811, 814-15 (Mo. App. W.D. 2016) (footnote omitted).

The overwhelming majority of Employer's arguments request this Court to disregard this long standing standard of review and ask us to reweigh the evidence and find Employer's witnesses to be more credible than the Employee's witnesses. This we cannot and will not do.

## Analysis

### Depression Causation

Employer's first three points on appeal each challenge the Commission's decision that Pace's depression constitutes a compensable injury under section 287.020.3.[2] The following evidence was presented to the Commission regarding Pace's depression diagnosis and the causes of her depression.

Dr. David Volarich ("Dr. Volarich") evaluated Pace in January of 2008 and diagnosed her with having depression. At that time, he referred Pace to a psychiatrist for

---

[2] All statutory references are to the Revised Statutes of Missouri 2000 as currently supplemented, unless otherwise indicated.

further evaluation. Dr. Volarich testified in 2012 that Pace continued to suffer from disabling depression. Dr. Barbara Markway ("Dr. Markway") evaluated Pace in February of 2008 and reached the medical conclusion that Pace suffered from depression, triggered by her 2002 accident and injury, which was exacerbated by her subsequent inability to work. Dr. Michael Jarvis ("Dr. Jarvis") examined Pace in November of 2008 and concluded that Pace did not suffer from a depression as a result of her injuries but rather was distressed by the workers' compensation claim process. Dr. A.E. Daniel ("Dr. Daniel"), a physician specializing in psychiatry, testified in the 2012 hearing regarding temporary benefits that Pace has a depressive disorder that is disabling. He testified that the pain resulting from Pace's October 4, 2002 accident and injury is the prevailing factor in the development of Pace's psychiatric disorder. Without seeing Pace again, Dr. Jarvis issued a supplemental report disagreeing with the conclusions of Dr. Daniel, concluding that Pace has an adjustment disorder with a depressive mood related to the litigation process rather than depression arising out of her work-related injury.

The ALJ concluded after considering the evidence above that "[b]oth Dr. Daniel and Dr. Jarvis agree that Ms. Pace suffers from depression related to the accident and injury of October 4, 2002, although the doctors disagree on the exact diagnosis and the part that the October 4, 2002 accident plays in the depression." The ALJ concluded that the depression was caused by Pace's work injury and, thus, compensation for the depression and treatment of the depression was warranted. The Commission, reviewing the ALJ's decision, found that the ALJ did not apply the proper statutory test regarding causation. The Commission

6

found that the appropriate test, pursuant to section 287.020.2 (RSMo 2000),[3] requires that for an injury to be compensable it must be related to work, which means that work was "a substantial factor in the cause of the resulting medical condition or disability."

The Commission then reviewed the evidence before the ALJ and adopted the ALJ's express findings with regard to the persuasive force of the competing expert opinions on the causation issue and adopted the ALJ's implied finding that Dr. Daniel was more persuasive in his testimony regarding the cause of Pace's depression. The Commission concluded that work was a substantial factor in causing her depression. The Commission also noted that Employer, in arguing that Pace had not proven causation, did not present facts or argument regarding why its expert should have been found to be more persuasive, but only that its expert's opinion must be accepted to the exclusion of all others. The Commission also noted that Employer repeatedly misstated the record in its arguments to the Commission.

Employer first argues, in Point One on appeal, that the Commission used the wrong legal standard for the causation required to permit compensation for Pace's depression by assuming that proof of depressive symptoms alone constituted proof of causation. Employer also argues in Points Two and Three on appeal that there was not substantial evidence supporting the Commission's finding regarding causation.

---

[3] Claimant's 2002 injury was governed by the law then in effect, which stated that "[a]n injury is compensable if it is clearly work related. An injury is clearly work related if work was a substantial factor in the cause of the resulting medical condition or disability." Section 287.020.2 RSMo (2000) (emphasis added). Future citations to this section will be to the RSMo (2000) version.

7

## Point One - Causation Legal Standard

In Point One on appeal, Employer argues that the Commission used the wrong legal standard when it found that Pace's depression was compensable. The claimant in a workers' compensation case has the burden to prove all the essential elements of her claim, including the causal connection between the injury and work. *Angus v. Second Injury Fund*, 328 S.W.3d 294, 299 (Mo. App. W.D. 2010).

> Determinations with regard to causation and work relatedness are questions of fact to be ruled upon by the Commission. Pursuant to the statute, "[a]n injury is clearly work related if work was a substantial factor in the cause of the resulting medical condition or disability." Section 287.020.2. Nonetheless, an injury is not compensable merely because work was a triggering or precipitating factor. Awards for injuries "triggered" or "precipitated" by work are nonetheless proper *if* the employee shows the work is a "substantial factor" in the cause of the injury. Thus, in determining whether a given injury is compensable, a work related accident can be both a triggering event and a substantial factor.

*Id*. (internal quotations and citations omitted).

Employer's Point One on appeal is perplexing as it claims the Commission erred in finding that work was a substantial factor in Pace's injury because it "assumed proof of depressive symptoms, alone, constituted proof of causation of that condition." Employer's point has no merit as the Commission explicitly accepted as credible and persuasive the expert medical testimony of Dr. Daniel and concluded from the evidence that work was a substantial factor in causing Pace's depression. Dr. Daniel in his report and deposition stated that, in his expert medical opinion as a psychiatrist, Pace suffers from depression that was directly caused by the injuries she suffered while working for Employer. Dr.

8

Daniel stated in his report that the onset of Pace's depression "is proximally related to the work injury on October 4, 2002 and subsequent chronic pain and unemployment" and that "the cause of Ms. Pace's psychiatric disorder is the work injury on October 4[,] 2002; therefore, the work-related injury is the prevailing factor." Although not explicitly stated, the Commission reasonably interpreted Dr. Daniel's opinion that work was the "prevailing factor" as satisfying the "substantial" factor requirement, the legal standard that applies here, which was reasonable, given that satisfying the "prevailing factor" standard is more difficult than meeting the "substantial factor" standard. *See Leake v. City of Fulton*, 316 S.W.3d 528, 531-32 (Mo. App. W.D. 2010) ("prevailing factor" standard is a higher standard than the previous "substantial factor" standard).

Employer complains that the Commission engaged in no analysis regarding causation. It is unclear to the Court what further analysis Employer believes was required. "[T]he question of causation is one for medical testimony, without which a finding for claimant would be based upon mere conjecture and speculation and not on substantial evidence." *Angus*, 328 S.W.3d at 300 (quoting *Elliott v. Kansas City, Mo., Sch. Dist.*, 71 S.W.3d 652, 658 (Mo. App. W.D. 2002)). The Commission considered the expert medical opinions provided as to the causation issue and accepted as credible and persuasive evidence that established work was a substantial factor in causing Pace's depression. This is all the law requires.[4] The Commission utilized the proper legal standard to determine causation as to Pace's depression.

---

[4] Employer's claim that the Commission's decision runs afoul of *Wilhite v. Hurd* is perplexing and without merit. Disregarding that a different causation standard was in effect in 1967, the case holds that the mere existence of a condition does not prove the condition was caused by work. 411 S.W.2d 72, 78 (Mo. 1967) (overruled on other

9

Point One is denied.

## Points Two and Three - Depression Causation Supported by Substantial and Competent Evidence

Employer's Points Two and Three on appeal both argue that the Commission erred because its finding of causation between Pace's work-related injury and her depression is not supported by substantial and competent evidence. In Point Two, Employer only argues that its expert, Dr. Jarvis, provided sufficient and competent evidence to prove that Pace does not have depression but rather has an "adjustment disorder." In Point Three, Employer attacks the medical opinions of Dr. Daniel and Dr. Markway and argues, as a matter of law, their opinions cannot constitute substantial and competent evidence as to causation. For ease of analysis we will consider the points in reverse order.

It is a well-settled principle that the "Court defers to the Commission on issues involving the credibility of witnesses and the weight to be given to their testimony." *Dierks v. Kraft Foods*, 471 S.W.3d 726, 733 (Mo. App. W.D. 2015). "Determinations with regard to causation and work-relatedness are questions of fact to be ruled upon by the Commission, and the reviewing court may not substitute its judgment on the weight of the evidence or on the credibility of witnesses for that of the Commission." *Id.* (quoting *Claspill v. Fed. Ex Freight East, Inc.*, 360 S.W.3d 894, 903 (Mo. App. S.D. 2012)).

> Where the right to compensation depends upon which of two conflicting medical theories should be accepted, the issue is peculiarly for the Commission's determination. When the evidence before the Commission would warrant either of two opposed findings, we are bound by the

grounds by *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003)). Here, the Commission explicitly accepted expert medical testimony that Pace's work injury was a substantial factor in causing her depression.

10

Commission's determination despite supportive evidence for the contrary finding.

*Id.* (internal quotations and citations omitted).

Dr. Daniel testified, and the ALJ found credible and persuasive, that "the injury [Pace] sustained at work on October 4th, 2002 [ . . . . ] is the prevailing factor leading to subsequent development of her psychiatric disorder." He also testified that although a number of other factors, including life events and other medical issues, likely contribute to Pace's depression, her work injury was the prevailing cause of Pace's current depression. In cross-examination, Dr. Daniel admitted that there were a few conditions suffered by Pace unrelated to her work injury of which he was unaware when he made his diagnosis of depression, including knee and back complaints following the workplace injury, but the Commission found that this did not sufficiently undermine his opinion as to causation. A report was also entered into evidence from Dr. Markway, who also conducted a psychological evaluation and similarly concluded that Pace suffers from depression that was triggered by her work injury. Dr. Markway, however, did not offer any opinion as to whether the injury was a prevailing or substantial factor in causing Pace's depression. As explained in Point One, Employer's expert, Dr. Jarvis, concluded that Pace's depression was not caused by her work-related injury but by the lengthy worker's compensation and litigation processes.

Where two experts provide medical opinions regarding causation, this Court's role is not to second-guess the Commission, as issues of medical causation are issues "peculiarly for the Commission's determination." *Dierks,* 471 S.W.3d at 733. Information

11

that Dr. Daniel did not have while examining Pace affects the weight that should be afforded his opinion, but that determination is left to the Commission. *See id*. The Commission found that Dr. Daniel's opinion remained persuasive. The ALJ and the Commission clearly found Dr. Daniel's testimony persuasive that Pace's depression was caused by the work-related injury. There is substantial and competent evidence in the record to support that determination.

Point Three is denied.

In Point Two on appeal, Employer merely states the reasons why it believes its expert, Dr. Jarvis, was more persuasive. Even where another expert's opinion would have supported a different finding as to causation, we are bound by the Commission's determination, which we have already decided was supported by substantial and competent evidence. *See id*. That Dr. Jarvis came to a contrary conclusion regarding causation is inconsequential.

Point Two is denied.

## Points Four and Five - Future Medical Treatment for Neck, Right Shoulder, and Depression

In Point Four on appeal, Employer argues the Commission erred in granting Pace future medical care for her neck and right shoulder because the decision was contrary to the overwhelming weight of the evidence as her physicians found that she had reached MMI for her neck and shoulder injuries and did not require additional treatment or medical care under section 287.140.1.

The following evidence was before the Commission relating to Pace's pain in connection with her neck and shoulder. In June of 2004, Dr. Graven evaluated Pace regarding her complaints of neck pain that radiated down into her right shoulder, arm and hand. Dr. Graven performed a selective nerve root block that provided temporary relief but excruciating pain returned in 12-24 hours. In September of 2004, Dr. Graven again noted Pace's continued pain and noted that Pace would continue her TTD status. After a cervical fusion was performed, Dr. Graven noted that Pace had trapezial pain and prescribed Pace Lidoderm patches and a Percocet prescription. The pain continued through early 2005, at which time Pace was referred to Dr. Theodore Rummel ("Dr. Rummel") to address a tear in her right rotator cuff. Dr. Rummel also noted in his first meeting with Pace that she had a burning pain in her trapezius area and he recommended that she receive pain management. Subsequent reports by Dr. Rummel address the healing of Pace's rotator cuff but are silent regarding whether Pace had continued pain. Dr. Rummel testified that, as of November of 2008, Pace's trapezius was a daily source of pain for her.

Dr. Volarich testified that after Pace had surgery on her shoulder and neck, Pace continued to have significant pain that originated in her neck. In his report, dated July 20, 2012, Dr. Volarich found that to maintain her current state, Pace will require ongoing care for her pain. He recommended that Pace receive future treatment at a pain clinic for pain related to Pace's cervical spine and right shoulder girdle. This would include steroid injections, nerve blocks and trigger point injections. Dr. Volarich also testified that it is difficult to know whether Pace's symptoms are due to shoulder pathology alone or if they come from the cervical spine. This is because Pace had a pathology in both areas.

13

Dr. Chabot, an orthopedic spine specialist who operated on Pace, testified that, as of August 25, 2011, Pace had improved motion in her shoulder and a reduction in pain complaints. Dr. Chabot believed Pace had reached MMI as of that date. Dr. Richard Howard ("Dr. Howard"), specializing in hand and upper extremity microsurgery, submitted an opinion letter, dated January of 2011, in which he stated that Pace had persistent complaints after her rotator cuff and neck surgeries in 2008 and continued pain in her AC joint.[5] He noted that in 2011 Pace continued to have pain in the top of her shoulder, along with numbness and tingling in her fingers, and a subcrominal injection from Dr. Chabot had provided no relief. He also noted that Pace has pain in her trapezius. Dr. Howard concluded that it was his opinion that Pace's symptoms were "more of a problem with neck pain" and she was at MMI for her right shoulder.

The ALJ found, as adopted by the Commission, that Pace was entitled to future medical treatment to treat her neck and right shoulder pain. As support, the ALJ cited Dr. Volarich's testimony regarding recommended pain treatment that was consistent with the treatments she had received from her treating physicians to alleviate the pain she still has in her right shoulder and neck.

The Missouri Workers' Compensation Act includes an allowance for future medical treatment for an injured worker pursuant to section 287.140.1, which provides in part:

> In addition to all other compensation ..., the employee shall receive and the employer shall provide such medical ... treatment, including nursing, custodial, ambulance and medicines, as may reasonably be required after the injury or disability, to cure and relieve from the effects of the injury.

___

[5] The "AC" joint is the acromioclavicular joint, located in the top of the shoulder.

14

*ABB Power T&D Co. v. Kempker*, 236 S.W.3d 43, 52 (Mo. App. W.D. 2007); *see also*

*Tillotson v. St. Joseph Med. Ctr.*, 347 S.W.3d 511, 518 (Mo. App. W.D. 2011). It is not

necessary for a claimant to provide conclusive evidence as to what future medical treatment

will be needed; rather, the claimant must demonstrate a "reasonable probability" that future

medical treatment will be necessary due to her work-related injury. *Kempker*, 236 S.W.3d

at 52-53. "An employer is required to compensate for future medical care only if 'the

evidence establishes a reasonable probability that additional medical treatment is needed

and, to a reasonable degree of medical certainty, that the need arose from the work injury.'"

*Id*. at 53 (quoting *Bowers v. Hiland Dairy Co*., 188 S.W.3d 79, 85 (Mo. App. S.D. 2006)).

We find substantial and competent evidence in the record to support the

Commission's finding that Pace sustained her burden of proof for future medical treatment

regarding her shoulder and neck. The record is clear that Pace had ongoing and persistent

pain resulting from her work-related injury. Pace continuously sought treatment for pain

related to both her neck and shoulder. Many doctors have evaluated Pace and there is

disagreement amongst them as to the exact cause of her pain. This is not surprising as there

was also testimony that sometimes it is difficult to determine the exact origin of pain in the

area of Pace's injury. Regardless of whether her pain originates in her shoulder or neck,

the fact remains that the evidence before the Commission supports the Commission's

conclusion that there is a reasonable probability that Pace will need ongoing treatment and

pain management related to her work-related injuries to her shoulder and neck, and she is

entitled to such.

In addition, Pace's entitlement to future medical benefits is not impacted by the fact she had reached MMI with regard to either her shoulder or neck. "Future medical care should not be denied simply because an employee may have achieved maximum medical improvement." *Greer v. SYSCO Food Servs.*, 475 S.W.3d 655, 673 (Mo. banc 2015). "[T]he statute contemplates medical treatment that gives comfort or relief even though a cure is beyond avail." *Id.* The Commission here found that there is a reasonable probability that based on expert medical testimony that Pace will need future medical treatment for her injuries. The statute provides for such. *See id.* (future medical treatment for pain provided by section 247.140.1 even if claimant had reached MMI with respect to his injury).

Point Four is denied.

In Point Five on appeal, Employer similarly argues that the Commission erred in finding that Pace is entitled to future medical care for her depression because that finding is not supported by substantial evidence.

In support of its argument, Employer again recites its preferred diagnosis from Dr. Jarvis, which concluded that Pace only suffers from an adjustment disorder with a depressive mood, and, in a conclusory fashion, opines that Dr. Daniel's testimony that Pace does indeed suffer from depression caused by her work-related injury is not substantial evidence. We have already found in points one through three above that Dr. Daniel's testimony constituted substantial and competent evidence that Pace suffers from depression and that her work-related injury was a substantial factor in causing that depression. Dr. Daniel testified that Pace's depression, caused by her work injury, is ongoing and, he recommended that Pace receive medication management and psychotherapy for her

16

depression.  This is sufficient evidence to support the Commission's finding that there is a reasonable probability that Pace will need future treatment for her depression.  We need not repeat again the citation to the various authorities previously set forth for this proposition.

Point Five is denied.

**Point Six - Temporary Total Disability - Stipulation**

In Point Six on appeal, Employer argues the Commission erred "as a matter of law in interpreting the parties' stipulation that, for purposes of calculating benefits" Pace reached MMI on August 25, 2011 "as an admission [that Pace] remained in need of treatment for her work injuries" and was, thus, totally disabled from November 17, 2005 through August 24, 2011 for the purposes of section 278.170.

"Temporary disability awards are intended to cover a healing period." *Greer,* 475 S.W.3d at 667 (quoting *Williams v. Pillsbury Co.*, 694 S.W.2d 488, 489 (Mo. App. E.D. 1985)).  "[TTD] benefits 'should be awarded only for the period before the employee can return to work.'" *Id*. (quoting *Cooper v. Med. Ctr. of Independence*, 955 S.W.2d 570, 575 (Mo. App. W.D. 1997)).  "A temporary award is not 'intended to encompass disability after the condition has reached the point where further progress is not expected.'" *Id*. (quoting *Williams*, 694 S.W.2d at 489).  "This is reflected in the language that a temporary total disability lasts only 'during the continuance of such disability.'" *Id*. (quoting *Cardwell v. Treasurer of the State of Mo.*, 249 S.W.3d 902, 909 (Mo. App. E.D. 2008)).

It is not disputed by Employer that the parties did stipulate before the ALJ that Pace reached MMI on August 25, 2011.  Employer, however, mischaracterizes the

Commission's view of that stipulation. The Commission's decision explicitly recognizes that the parties disputed whether Pace was temporarily and totally disabled from November 17, 2005 to August 24, 2011. In granting Pace TTD for the whole of this time period, the Commission credited Pace's testimony that she was not able to work after Dr. Rummel released her from treatment in November of 2005. *See Patterson v. Eng'g Evaluations Inspections, Inc*., 913 S.W.2d 344, 347 (Mo. App. E.D. 1995) (a layman is capable of forming an opinion as to whether she is capable of working and is sufficient evidence upon which to base an award of TTD). The Commission supports this finding with citation to additional evidence from Dr. Chabot that Pace came to him in 2011 with pain complaints identical to her complaints when she saw him in October 2009. The Commission also cites as additional support the "voluminous evidence of additional evaluation and treatment [Pace] sought and required after November 30, 2010, as a result of the effects of her work injury."

The Commission's only reference to the parties' stipulation is in a footnote in its decision and states the following: "[t]he parties' stipulation that employee did not reach MMI until August 25, 2011, strikes us as an implicit acknowledgment that Dr. Rummel's release in November 2005 was premature, and that employee remained in need of additional and significant medical care as a result of the work injury." Contrary to Employer's argument, the Commission did not treat the stipulation as conclusive proof that Pace remained in need of care but only as additional evidence bolstering the Commission's independent finding that Pace qualified for TTD during the disputed time period.

Point Six is denied.

18

**Point Seven - Temporary Total Disability - Engaged in Rehabilitative Process**

In Point Seven on appeal, Employer argues the Commission erred in finding that Pace was engaged in the "rehabilitative process" between November 17, 2005 and January 2, 2011 because that finding is contrary to the overwhelming weight of the evidence.

Pursuant to section 287.149, TTD or partial disability benefits are to be paid "throughout the rehabilitative process." Whether a treatment is "part of the rehabilitative process is a fact question for the commission." *Greer*, 475 S.W.3d at 671. The Commission found that Pace persuasively testified that she continually sought help for her condition (i.e. pain related to her work-related injuries) after she was released by Dr. Rummel on November 17, 2005. The Commission found that the evidence supported Pace's testimony that the pain related to her work injury "remained consistent and unabated throughout that period." The Commission also found that, during this time, Pace had "ongoing and severely limiting complaints and symptoms referable to the work injury which affected her cervical spine, dominant right arm, and body as a whole in the form of depression."

The evidence supports the Commission's decision that from Pace's release from Dr. Rummel in November of 2005 to January 2, 2011, Pace was consistently engaged in the rehabilitative process. As recognized by the Commission, the parties' stipulation that Pace did not reach MMI for her work related injuries until August 25, 2011 is *some* evidence that Pace's release from care in 2005 was premature. Although not conclusive, it does support Pace's testimony, found credible by the Commission, that during the entire time

period in dispute she was suffering from pain related to her work injury such that she could not work.

In *Greer*, the Missouri Supreme Court addressed the meaning of "rehabilitative process" and its relation to MMI. 475 S.W.3d at 670. In that case, the employee suffered from tarsal tunnel syndrome related to a work-related injury starting in February 2007. *Id*. His treating doctor found that the employee had reached MMI regarding that injury in April of 2007, and the employee then returned to work. *Id*. The employee, however, continued to experience symptoms that impacted his ability to work. *Id*. The employee then went to additional doctors and sought additional treatment. *Id*. The Supreme Court found that all of these actions, including actions taken after his doctor had found his injury had reached MMI, were "intended to restore Greer to a condition of health or normal activity by a process of medical rehabilitation." *Id*. In addition, whether the treatment is successful it is "immaterial" to the determination of whether a treatment is part of the rehabilitative process. *Id*. at 670-71. As explained by *Greer*,

> [i]t is plausible, and likely probable, that the maximum medical improvement date and the end of the rehabilitative process will coincide, thus, marking the end of the period when TTD benefits can be awarded. However, when the commission is presented with evidence, as here, that a claimant has reached maximum medical improvement yet seeks additional treatment beyond that date for the work-related injury in an attempt to restore himself or herself to a condition of health or normal activity by a process of medical rehabilitation, the commission must make a factual determination as to whether the additional treatment was part of the rehabilitative process. If the commission determines the additional treatment was part of the claimant's rehabilitative process, then he or she is entitled to TTD benefits pursuant to section 287.149.1 until the rehabilitative process is complete. Once the rehabilitation process ends, the commission then must make a determination regarding the permanency of a claimant's injuries.

*Id*. at 668-69.

Like *Greer*, Pace continued to seek treatment for pain related to her work-related injury despite the fact that multiple doctors had found she had reached MMI. As explained above, Pace's medical records support her claim that she continued to experience pain throughout the disputed time period and sought treatment for that pain.[6] The Commission made a factual determination that the treatment sought by Pace was an attempt by her to restore herself to health or normal activity and, thus, was part of the rehabilitative process associated with her work-related injury. This finding by the Commission was not against the weight of the evidence, as the evidence marshalled by Employer does not take into account Pace's continuous seeking of treatment for pain and her own testimony, found credible by the Commission, that she was not able to work as a result of that pain.

Point Seven is denied.

### Point Eight - Modification of the Temporary Award Regarding Temporary Total Disability Benefits

In Point Eight on appeal, Employer argues the Commission erred in modifying the ALJ's finding in the temporary award that Pace was not entitled to TTD following November 17, 2005, because Pace failed to present additional significant evidence on that issue at the final hearing that was not before the ALJ at the time she issued the temporary award.

---

[6] Employer's argument completely neglects that, in addition to shoulder and neck problems and pain associated therewith, the evidence showed the Pace suffered from depression that arose out of her work injury throughout this time period and was seeking treatment for that depression.

21

In support of this argument, Employer relies on *Jennings v. Station Casino St. Charles*, 196 S.W.3d 552 (Mo. App. E.D. 2006). In *Jennings*, the Court explained that even though the law clearly contemplates that an ALJ may render a decision at a final hearing which differs from the temporary award, in order to do so the final award must find there was "additional significant evidence" not before the ALJ at the temporary award that was presented for consideration in the final award. *Id*. at 558.

This argument was raised before the Commission, and the Commission found that there was, in fact, additional significant evidence presented at the final award hearing to support the modification of the temporary award. The Commission cited "voluminous evidence of additional evaluation and treatment [Pace] sought and required after November 30, 2010," the date of the temporary award. This includes a record from Dr. Chabot that indicated that, as of January 3, 2011, Pace was presenting with the same complaints and symptoms that she had in October of 2009. The Commission also cites as additional significant evidence Pace's testimony in the final award hearing regarding her inability to work throughout the disputed time period.

Employer recognizes the "additional significant evidence" cited by the Commission, but argues that Pace's "subjective complaints, alone, cannot support the TTD award." Employer cites two statutes to support this bold assertion. A review of the statutes, however, reveal that they have nothing to say at all about whether a subjective experience of pain can support a finding of TTD.[7] Employer has cited nothing that supports its

_____

[7] Employer cites section 287.020.6, which is the definition of total disability as the "inability to return to any employment and not merely mean inability to return to the employment in which the employee was engaged at the time of the accident." Employer also cites section 287.070 which sets out the method of payment for TTD.

22

argument that subsequent visits to a doctor regarding pain, subsequent reports of those visits, and additional testimony elicited from a claimant, including multiple failed attempts to work in even part-time positions, are insufficient to meet the "additional significant evidence standard." We agree with the Commission that the subsequent evidence cited by the Commission supports its modification of the temporary award.

Point Eight is denied.

## Points Nine and Ten - Finding of Permanent and Total Disability

In Point Nine on appeal, Employer argues that the Commission erred in finding that Employee was PTD because its finding is not supported by substantial evidence. In Point Ten, Employer argues that the Commission failed to use the appropriate statutory standards governing PTD under section 287.020.6. As these points are interrelated, we will consider them together.

> Section 287.020.6 defines "total disability" as the "inability to return to any employment and not merely [the] inability to return to the employment in which the employee was engaged at the time of the accident." The test for permanent total disability is the worker's ability to compete in the open labor market because it measures the worker's potential for returning to employment. The ability to compete in the open labor market hinges on whether, in the ordinary course of business, any employer would be reasonably expected to hire the individual given his or her present physical condition. Employability is a matter within the [c]ommission's expertise. [Employee] bears the burden of proving he is entitled to PTD benefits

*Greer,* 475 S.W.3d at 664-65 (internal citations and quotation marks omitted).

The Commission found that Pace sustained her burden of proof that she is PTD as the result of her neck and right shoulder injuries coupled with her depressive symptoms. It

23

was stipulated that Pace had reached MMI as of August 25, 2011, which is the date at which PTD must be established. *See Cardwell,* 249 S.W.3d at 908-10.

Dr. Volarich testified regarding his medical opinion as to Pace's ability to be employed on the open labor market. Dr. Volarich testified that, in his opinion, Pace has a fifty percent permanent partial disability of the body as a whole rated at the cervical spine. This rating took into account all of her neck pain syndrome, lost motion, and ongoing right upper extremity paresthesias with radicular symptoms. He also found a forty percent permanent partial disability of the right upper extremity at the shoulder due to impingement and a rotator cuff tear. In addition, Dr. Volarich found that Pace suffers from depression. Dr. Volarich testified that Pace

> cannot be reasonably expected to perform on an ongoing basis eight hours a day, five days a week throughout the work year. It was also my opinion that she was unable to continue in her line of employment that she last held as a waitress for the Jefferson City Country Club nor could she be expected to be [sic] to work on a full-time basis in a similar job. After review of additional medical records and my re-examination on July 20, 2012, it was my opinion that Ms. Pace was permanently and totally disabled as a direct result of the work related injury of 10/4/02 standing alone.

In addition, Dr. Daniel, who conducted a psychiatric evaluation of Pace, concluded as well that "due to the combined impact of the psychiatric disorders and physical conditions, Ms. Pace is unable to compete in the open labor market."

The Commission also found persuasive the testimony of Gary Weimholt ("Mr. Weimholt"), a vocational expert, who relied primarily on the findings of Dr. Volarich and Dr. Daniel in reaching his opinions. Mr. Weimholt issued an initial report regarding Pace's vocational disability in May of 2008 and issued a supplemental report in 2013. Mr.

24

Weimholt testified that Pace would not be employable in the open labor market due to her work injury related to her cervical spine and right shoulder. The Commission found that Pace's work restrictions, lack of transferable work skills, and inability to engage in regular sustained activity combined to establish that she is unemployable in the open labor market.

"Under section 287.020, the term 'total disability' is defined as the 'inability to return to any employment and not merely ... inability to return to the employment in which the employee was engaged at the time of the accident." *Scott v. Treasurer of State-Custodian of Second Injury Fund*, 417 S.W.3d 381, 386 (Mo. App. W.D. 2014). "Any employment" means any "reasonable or normal employment or occupation." *Id*. at 387. "'Total disability' does not require the employee to be completely inactive or inert, rather, it means the inability to return to any reasonable or normal employment." *Id*. Further, the question of whether a claimant is totally and permanently disabled is "not exclusively a medical question" and the Commission "need not rely exclusively on the testimony of medical experts; rather, it may consider all the evidence and the reasonable inferences drawn from that evidence." *Lewis v. Kansas Univ. Med. Ctr.*, 356 S.W.3d 796, 802 (Mo. App. W.D. 2011). The Commission may even rely on testimony from the claimant herself. *See Pavia v. Smitty's Supermarket*, 118 S.W.3d 228, 234 (Mo. App. S.D. 2003). "The testimony of ... lay witnesses as to facts within the realm of lay understanding can constitute substantial evidence of the nature, cause, and extent of the disability, especially when taken in connection with, or where supported by, some medical evidence." *Id*.

"The Commission is not bound by the expert's exact percentages and is free to find a disability rating higher or lower than that expressed in medical testimony. The extent

25

and percentage of disability is a finding of fact within the special province of the Industrial Commission." *Lewis*, 356 S.W.3d at 802 (quoting *Pavia*, 118 S.W.3d at 234) (internal citations omitted); *see also Greer*, 475 S.W.3d at 665 ("Employability is a matter within the [c]ommission's expertise….")

Employer argues that the Commission's finding that Pace was permanently and totally disabled is not supported by substantial evidence because the vocational expert who testified for Pace, Mr. Weimholt, formed an opinion without seeing all of Pace's medical records and without reviewing the 2010 hearing transcript. In his deposition, Mr. Weimholt admitted that he relied upon the diagnoses and opinions of Dr. Volarich and Dr. Daniel and did not review the reports from any other doctors who had seen Pace. Assuming that Mr. Weimholt made a decision without all the pertinent information and that this makes his testimony not credible, which is not necessarily the case, Employer ignores other substantial evidence before the Commission. In addition to the reports and deposition testimony of Drs. Volarich and Daniel, both of whom concluded that that they do not believe Pace is employable in an open and competitive labor market, the Commission also credited Pace's testimony to the same effect.

It is undisputed that the experts hired by Employer and medical experts relied upon by them concluded differently. This, however, does not mean that the Commission's decision is not supported by competent and substantial evidence. "This Court 'may not substitute its judgment on the evidence,' and when the 'evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the

26

contrary finding.'" *Greer*, 475 S.W.3d at 665 (quoting *Hornbeck v. Spectra Painting, Inc.*, 370 S.W.3d 624, 629 (Mo. banc 2012)). Findings as to the extent and percentage of disability are findings of fact within the special province of the Commission and where, as we have here, the Commission's decision is supported by the credible testimony of the claimant herself and supported by medical evidence from two medical experts, also found credible by the Commission, this Court must and does defer to the Commission. *See Lewis*, 356 S.W.3d at 802; *see also Greer*, 475 S.W.3d at 665.

Point Nine is denied.

Employer's argument in Point Ten on appeal that the Commission failed to utilize the appropriate statutory standards governing permanent and total disability is unfounded. Employer complains that the Commission relied on the fact that Pace underwent additional neck surgery and had ongoing, non-operable, subjective right shoulder complaints and psychiatric symptoms to find that she was PTD. This is true in part. As explained above, the Commission found that Pace is disabled "as the result of her neck and right shoulder injuries coupled with her depressive symptoms." The Commission also noted that, since 2010, Pace has even less range of motion in her neck and continued symptoms, including pain, for which no physician has recommended additional surgical intervention. A reasonable inference from this finding is that the pain will continue and will remain an obstacle to employment.

Dr. Volarich, Dr. Daniel, and Pace herself testified that, as a result of her work injury, she is unable to participate and find work in the open and competitive labor market. The Commission explicitly found that "Ms. Pace's restrictions, lack of transferable work

27

skills, and inability to engage in regular sustained activity combined to establish that Ms. Pace is unemployable in the open labor market." The Commission applied the appropriate legal standard as it answered the question whether, in the ordinary course of business, any employer would reasonably be expected to hire the worker in her physical condition. *Lewis*, 356 S.W.3d at 800; *see also Greer*, 475 S.W.3d at 664-65. The Commission determined that the answer is no and that determination is fully supported by the record.

Point Ten is denied.

**Point Eleven - Second Injury Fund Liability**

In Point Eleven on appeal, Employer argues the Commission erred in holding Employer liable for PTD benefits because the Second Injury Fund (the "Fund") is liable, in that Pace's PTD arose from all her injuries and conditions, both work and non-work related.

The Fund was created "to encourage the employment of individuals who are already disabled from a preexisting injury, regardless of the type or cause of that injury." *Treasurer of State–Custodian of Second Injury Fund v. Witte*, 414 S.W.3d 455, 460 (Mo. banc 2013). The Fund accomplishes this objective by ensuring that an employer will only be responsible for a disability that results from an injury attributable to that employer, and "[a]ny disability attributable to the combination of the work injury with preexisting disabilities is compensated, if at all, by the fund." *Id*.

The Commission found there was no Fund liability because Pace did not suffer from a preexisting disability prior to her October 4, 2002 work injury. This conclusion is supported by Dr. Volarich who reported that, prior to her work injury, Pace's only

28

preexisting diagnosis was for a minor cervical strain, which was resolved and asymptomatic, and that she had no other preexisting disability. Dr. Daniel found that, prior to her work injury, Pace did not have a preexisting psychiatric disorder.

Employer does not even attempt to argue that Pace suffered from a preexisting disability but argues only that her PTD is the result of her work-related injuries combined with her back and knee conditions. This is insufficient to create Fund liability. As there is no evidence in the record to support that Pace had a preexisting disability at the time she was injured, the Commission did not err in finding the Fund was not liable.

Point Eleven is denied.

## Conclusion

The Final Award of the Commission is affirmed.

_____
Gary D. Witt, Judge

All concur

29