

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

GARY SCOTT, )
                 )
        Appellant, )
                 )
     v. )       WD76602 (Consolidated with WD76603)
                 )
TREASURER OF THE STATE OF )       Opinion filed:  January 14, 2014
MISSOURI-CUSTODIAN OF THE )
SECOND INJURY FUND, )
                 )
        Respondent. )

**APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION**

Before Division Two:  Mark D. Pfeiffer, Presiding Judge,
Joseph M. Ellis, Judge and Victor C. Howard, Judge

Gary Scott ("Appellant") appeals from the Labor and Industrial Relations Commission's decision concluding that he was not entitled to any benefits from the Second Injury Fund ("the Fund") for injuries he sustained on January 11, 2008, and December 3, 2009, based upon a finding that he was already permanently and totally disabled prior to the January 2008 injury.  For the following reasons, the Commission's decision is reversed and the cause is remanded for further proceedings.

Appellant was born on August 4, 1941.  He dropped out of school in the ninth grade and began working -- operating heavy equipment and doing excavation work on a

contract basis. At some point, Appellant incorporated his business under the name Gary Scott Excavating. Appellant was an employee of that company and continued to be employed by that company until after his December 3, 2009 injury. Because he has trouble reading and was unable to handle bookkeeping, most of the administrative bookkeeping and paperwork of Gary Scott Excavating was handled by Appellant's brother, wives, or other company employees.

Since childhood, Appellant has experienced increasing hearing problems, and he eventually received a cochlear implant in 2002. His hearing problems limited his ability to use the telephone and caused difficulty communicating with employees and customers at work.

Prior to the injuries giving rise to the claims at issue in this case, Appellant suffered several physical injuries. In 1998, Appellant had open rotator cuff surgery to repair a work-related tear of his right rotator cuff. After recovering from surgery, Appellant had some difficulty using his right arm to climb and generally using his right shoulder.

On November 4, 2001, Appellant fell 22 feet from a grain bin and fractured his right leg, right foot, and left foot. Appellant had to wear CAM walker boots on both lower extremities for two years following that injury and had to have employees run the business during that time. After he returned to work, the lingering effects of this injury eventually limited his ability to walk more than 50 feet before experiencing pain, his ability to stand for lengthy periods, and his ability to climb onto larger pieces of equipment.[1] Appellant would drive his pickup truck as close as he could to whatever he was doing to limit the walking distance. He could no longer climb onto his larger

---

[1] During his first year back at work, Appellant continued to use crutches to help him get around.

2

bulldozers or one of his excavators, and it would take him three to five minutes to get onto other pieces of equipment.

In 2004, Appellant was successfully treated surgically for bilateral carpal tunnel syndrome. In 2006, Appellant had colon surgery, after which he was cautioned to stop lifting weights of 150 pounds and greater. In 2007, when Appellant was 66-years-old, Appellant was diagnosed with arthritis which affected the use of his hands and would cause pain at the sites of his prior injuries. Also, in April 2007, Appellant developed a hernia, which was diagnosed but not treated, while he was pushing a 300 pound tree.

On January 11, 2008, while driving a bulldozer over rough, frozen terrain, Appellant injured his back. Appellant developed disabling symptoms, eventually requiring a decompressive laminectomy at L3-L4 that was performed by Dr. Stephen Reintjes on August 28, 2008. On October 29, 2008, Dr. Reintjes found that Appellant had reached maximum medical improvement. Dr. Reintjes released Appellant to return to work but restricted him to lifting no more than fifty pounds. Dr. Reintjes also ordered Appellant to limit bending and twisting and to sit for no more than one or two hours at a time.

In the course of treating Appellant for his back problems in 2008, Dr. Scott diagnosed Appellant with two hernias and referred him to Dr. Wetzel for treatment. After Appellant had sufficiently recovered from his back surgery, on January 21, 2009, Dr. Wetzel surgically repaired the two hernias.[2] On March 13, 2009, Dr. Wetzel released Appellant to general activities and, while noting that Appellant continued to be limited by his back and right side flank pain that might require an epidural if it continued,

---

[2] While Appellant's testimony and the Commission's findings reflect that Appellant sustained several hernias, all of the medical records reflect that he had two.

3

indicated that "the time is drawing close that he should be able to return to his employment." Appellant eventually returned to work operating various machinery and supervising his employees but limited how much lifting and vehicle maintenance work he would do.

On December 3, 2009, Appellant was attempting to position a 115 pound battery in a piece of equipment when he injured his chest and right shoulder. As a result of that injury, Appellant's doctor performed an arthroscopic labral debridement and open subscapularis repair on February 23, 2010. Appellant was eventually released to return to work with restrictions of no lifting over fifty pounds and no repetitive lifting or reaching above the shoulder with his right arm. Fearful of reinjuring his shoulder, Appellant stopped working after that injury.

Appellant filed timely workers compensation claims against his employer and the Second Injury Fund related to the hernias, the back injury, and the chest and shoulder injuries. Appellant eventually entered into settlement agreements with his employer on all of those claims.[3] On March 7, 2012, Appellant's claims against the Fund related to the January 2008 back injury and the December 2009 shoulder injury were heard by an administrative law judge.[4] On August 28, 2012, the ALJ issued his decision finding that Appellant was permanently totally disabled prior to either claimed injury and that the

---

[3] Appellant settled his claim related to the hernias with the permanent partial disability resulting from that injury set at 6.5% to the body as a whole. His claim related to the back was settled with Employer with the PPD set at 22.5% to the body as a whole and the claim related to his shoulder was settled at 22.5% at the level of the shoulder.

[4] Appellant appears to have elected not to pursue his claim against the Fund related to the hernias because his claim against Employer was settled at 6.5% to the body as a whole and his expert, Dr. Koprivica, opined that there was no Fund liability associated with that injury. Indeed, Dr. Koprivica testified regarding the hernias that the scarring from Appellant's surgery would "impact [his] lifting and carrying to a minor degree." He stated, "I think there is some disability from each of those hernias, but I consider them to be very minor or mild in nature."

4

Fund was, therefore, not liable to pay him any benefits. The decision stated, in relevant

part:

> For Second Injury Fund liability for permanent and total disability to exist, the previous disability and the last injury must combine together to result in permanent and total disability. Mr. Scott is permanently and totally disabled as a result of his previous disabilities alone, and was not employable on the open labor market at the time of his 2008 and 2009 injuries, in spite of working. His numerous disabilities pre-existing his 2008 injury are outlined:
>
> Mr. Scott tore his right rotator cuff in 1998. Dr. Koprivica noted disability from this injury in regard to climbing and using his right shoulder.
>
> Mr. Scott fell 22 feet in 2001 which shattered bones in his leg and feet. He spent two years with his leg in a CAM walker. This injury significantly limited his walking and he still has considerable problems from his this [sic] injury to his lower extremities. Mr. Scott reported after this 2001 right leg injury he had a very difficult time getting on and off machinery and only maintained employment by being self employed. He was able to put the brunt of the work on his employees and participate only by overseeing the work. Mr. Scott saw Dr. Bellamy from St. Luke's Medical on March 29, 2007. Dr. Bellamy recorded at that visit that Gary reported not being able to walk even 50 feet without having to stop and rest because of the discomfort. Dr. Koprivica suggested restrictions based on Mr. Scott's lower extremity disability: limit walking and standing to 15 minutes and avoid climbing.
>
> He also has a history of major hearing problems which require cochlear implants. The hearing problems date back as far as middle school. He dropped out of school because he could not hear the teacher. He reads very little and cannot operate a computer making it difficult for him to do tasks related to operating an excavating business.
>
> In 2007, Mr. Scott had several hernias. Mr. Scott reported that he never recovered from his hernias and that Dr. Scott, his primary care physician, told him to stop working and that he had to quit working.
>
> Mr. Dreiling testified that Mr. Scott was 'at a very distinct disadvantage' in competing for training and supervisory jobs for another company considering his hearing, communication skills and educational background. When [sic] the severe pain, and physical restrictions he faced from his lower extremity injuries, his hernias, and his first shoulder injury, it is clear that the only reason Mr. Scott was able to work was because he was majorly self-accommodating as a business owner. Until

5

his retirement, Mr. Scott did continue to earn an income because he owned his own business, but only because he made major accommodations for himself regarding what equipment he would operate, and relying on his wives to perform more intellectually demanding tasks. Mr. Dreiling agreed that Mr. Scott would not have the ability of self-accommodation in the open labor market like he did in his own business and that no jobs exist in the open labor market that would let him simply show other employees how to operate equipment without performing some work himself. The Second Injury Fund is not liable for Mr. Scott's 2008 and 2009 work injuries as his permanent and total disability arises based on his injuries that pre-date 2008.

* * *

This Court can properly determine that the cause for permanent and total disability was Mr. Scott's pre-existing problems. First, because nature and extent of disability is at issue, and not medical causation, the Court is free to look to the whole record and not just to the medical expert in the case. Nature and extent of disability is a separate issue from medical causation and extent of disability is not medically technical. Second, according to Mr. Scott's testimony, at least one doctor asked him to stop working when he began having hernias in 2007. Third, because the issue in this case is not medical causation of an injury, it is appropriate for the Court to make findings of fact regarding Mr. Scott's abilities and disability before the last accident. As outlined above, Mr. Scott's hearing problems since childhood, his extremely limited ability to walk due to foot injuries, problems from his first shoulder injury, and the pain and lifting limitations associated with his hernias, Mr. Scott was clearly permanently and totally disabled before 2008 and as such unemployable on the open labor market.

I find therefore, the Second Injury Fund has no liability to the Claimant for the injuries claimed on November 1, 2008 or December 3, 2009, and award no compensation.

Appellant appealed to the Commission, which affirmed the decision of the ALJ and adopted it as its own.

In his sole point on appeal from the Commission's decision, Appellant contends that the Commission's finding that he was permanently totally disabled prior to his January 11, 2008 injury is not supported by sufficient competent and substantial evidence.

6

Pursuant to § 287.495.1, this Court may only reverse an award issued by the Commission where the Commission acted without or in excess of its authority, the award was procured by fraud, the facts found by the Commission do not support the award, or the record does not contain sufficient competent and substantial evidence to support the award. "To determine whether an award is supported by competent and substantial evidence, we examine the evidence in the context of the whole record." *Cardwell v. Treasurer of State of Missouri*, 249 S.W.3d 902, 906 (Mo. App. E.D. 2008). "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Id*. "In reviewing the Commission's decision, we view the evidence objectively and not in the light most favorable to the decision of the Commission." *Poarch v. Treasurer of State Custodian of Missouri-Custodian of Second Injury Fund*, 365 S.W.3d 638, 642 (Mo. App. W.D. 2012). "However, we defer to the Commission on issues involving the credibility of witnesses and the weight given to their testimony." *Id*. "When, as here, the Commission affirms and adopts the ALJ's award, we review the ALJ's findings as adopted by the Commission." *Id*. (internal quotation omitted).

"Section 287.220 imposes liability upon the Second Injury Fund in certain cases of permanent disability where there had been a preexisting disability." *Highley v. Von Weise Gear*, 247 S.W.3d 52, 55 (Mo. App. E.D. 2008). "The Second Injury Fund is liable where a claimant establishes either that the preexisting partial disability combined with a disability from a subsequent injury to create a permanent and total disability, or the two disabilities combined result in a greater disability than that which would have occurred from the last injury alone." *Id*.

7

In this case, the Commission determined that the Fund was not liable because Appellant was permanently and totally disabled prior to his January 2008 injury. Appellant argues on appeal that that determination was not supported by substantial and competent evidence and was, in the context of the record viewed as a whole, against the overwhelming weight of the evidence.

"Under section 287.020, the term 'total disability' is defined as the 'inability to return to any employment and not merely . . . inability to return to the employment in which the employee was engaged at the time of the accident.'" *Grauberger v. Atlas Van Lines, Inc.*, No. SD32139, SD23154, 2013 WL 791537 at *4 (Mo. App. S.D. March 4, 2013). "'Any employment' means any reasonable or normal employment or occupation." *Mell v. Beilbel Bros., Inc.*, 247 S.W.3d 26, 29 (Mo. App. E.D. 2008). "The test for permanent total disability is whether the worker is able to compete in the open labor market." *Molder v. Missouri State Treasurer*, 342 S.W.3d 406, 411 (Mo. App. W.D. 2011) (internal quotation omitted). "The critical question is whether, in the ordinary course of business, *any employer* reasonably would be expected to hire the injured worker, given his present physical condition.'" *Id.* (internal quotation omitted and emphasis added). "'Total disability' does not require the employee to be completely inactive or inert, rather, it means the inability to return to any reasonable or normal employment." *Underwood v. High Road Indus., LLC*, 369 S.W.3d 59, 66 (Mo. App. S.D. 2012).

When viewed in the context of the entire record, several of the Commission's findings are simply not supported by substantial and competent evidence and are against the overwhelming weight of the evidence. The Commission is not allowed to

8

"base its findings upon conjecture or its own opinion unsupported by sufficient evidence." *Highley*, 247 S.W.3d at 57.

We initially note that the Commission's decision appears to imply that Appellant's sole function at work after his 2001 leg and foot injury was overseeing the work. Appellant's testimony, the medical records, and the report and testimony of the occupational expert all reflect that, after two or three years of recovery from that 2001 injury, Appellant resumed performing lifting, loading, and vehicle maintenance duties and that he would operate pieces of heavy equipment for as much as eight to twelve hours a day. To the extent that the Commission determined that Appellant's sole work function was overseeing the work and training employees after his 2001 injury, such a finding is not supported by substantial and competent evidence.

The Commission's finding that at least one of his doctors told Appellant in 2007 that he had "to stop working" is likewise not supported by substantial and competent evidence and is against the overwhelming weight of the evidence. First, none of the medical records support that finding. Dr. Scott's records reflect a couple of occasions where he advised Appellant to ease up on his work related to other non-hernia related physical problems;[5] certainly, if those recommendations were reflected in the records,

---

[5] Dr. Scott's notes from April 24, 2007, reflect that he suspects Appellant might have a hernia but that Appellant was declining a surgical consultation. Dr. Scott noted that he suggested regular stretching exercises to Appellant before he starts his work day.

Dr. Scott's notes from September 20, 2007, note that Appellant was there because of arthritis, coronary artery disease, and hypertension and that he recently dropped a very heavy object on his right foot. Dr. Scott noted: "He probably works more than he should. He has lost weight, however."

Dr. Scott's notes from March 5, 2008, state:

> He has occasional tenderness in the left, lower quadrant. . . . If his intermittent abdominal tenderness continues, he is to call or return for further evaluation and possible CT of the abdomen and pelvis. . . . He has not [sic] hernia.

Dr. Scott would have similarly memorialized recommending that Appellant stop working entirely based upon his hernias and his general recommendations subsequent to the hernia surgery would have been stronger than the suggestion that "he decrease the pace of his work" reflected in an examination note from July 17, 2009. Dr. Wetzel first treated Appellant for his hernias in 2008, subsequent to Appellant's January 2008 back injury, so he could not have advised him to stop working in 2007, and Dr. Wetzel's records do not reflect any work restrictions related to the hernias aside from a three-week prohibition from working following the hernia surgery.[6] Furthermore, Dr. Wetzel's records from March 13, 2009, reflect that he was releasing Appellant to return to his general activities without expressing any restrictions related to the hernias, though he

Dr. Scott's notes from April 10, 2008, state:

> Mr. Scott is here because he just does not feel good. He is not able to work 12 hours a day. He has pain in his back which he has had since he drove his tractor over very rough ground a few weeks ago. . . . I recommend a CT of his lumbar spine be obtained, Physical Therapy evaluation and possibly pain clinic. He complains of fatigue although I suspect it is due to the pain. . . . He is to pace himself and limit his activity a little more regularly.

Dr. Scott's notes from May 27, 2008, state:

> Mr. Scott is here because of his back pain. He is known to have spinal stenosis. He has a lot of pain down his legs when standing. He has had two epidurals. He is scheduled for a third one next week. He reports that this started when he rode his tractor a lot. He got one epidural a few weeks ago. He got better but went back on the tractor, planted some more acreage and it made his pain worse. He got a second epidural but has still been on his tractor. Sitting and lying, he is comfortable. . . . I warned him against going back to work on the tractor, if it keeps on aggravating his condition. . . . He needs to alter his activities and he is pretty reluctant to do so.

Dr. Scott's records reflect that on July 17, 2009, when Appellant came to him complaining of pain in his right hand and feeling like his heart was going to go out after working hard all morning, Dr. Scott "suggested he decrease the pace of his work." That report also states, "He is still concerned about the site of his abdominal hernia repair this spring. CT of his abdomen was done in March after that surgery that did not show any significant findings. . . . I suspect some of what he is feeling may just be scarring or healing."

[6] Appellant already had weight restrictions placed upon him by the doctors treating his back injury when he was being treated by Dr. Wetzel for the hernias. It is certainly possible that Dr. Wetzel might have placed some sort of less stringent weight restriction upon Appellant, at least on a temporary basis, in the absence of those pre-existing restrictions.

10

noted that Appellant was complaining of some back and right side flank pain that was limiting Appellant and might require an epidural in the future, and notes that "the time is drawing close that he should be able to return to his employment." Certainly, neither set of doctor's records supports a finding that either Dr. Scott or Dr. Wetzel believed that Appellant was completely and totally disabled and unable to work at any job prior to his January 2008 back injury or that they conveyed to Appellant that he should quit working.

The Commission's finding was based solely on Appellant's testimony that his doctors told him to stop working after his double hernia diagnosis and surgery.[7] Appellant testified that he was diagnosed with the hernias while he was receiving treatment for his January 2008 back injury, and his hernia surgery was performed on January 21, 2009, approximately five months after his back surgery. Thus, Appellant's testimony reflects that he was not advised to stop working until sometime after his back injury in January 2008. Accordingly, the Commission's finding that Appellant was told by a doctor to quit working in 2007, which would have been prior to his back injury, is not supported by substantial and competent evidence. If a doctor generally advised Appellant to stop working in 2008 or 2009, as testified to by Appellant, part of that consideration would necessarily have involved the problems and restrictions resulting from Appellant's back injury. Moreover, in the context of his entire testimony, Appellant stated that his doctors advised him to ease up on or stop doing the physical work he

---

[7] The Commission deemed Appellant's testimony to be credible, and under our standard of review, we are required to defer to the Commission's credibility determinations. *Poarch*, 365 S.W.3d at 642. Thus, even if this Court would have assessed credibility differently in light of the fact that Appellant has significant hearing loss that seemed to have hampered his ability to hear and understand some of the questions asked of him, that Appellant had been treated for memory loss problems prior to the hearing before the ALJ, and that the medical records repeatedly reference Appellant's poor ability to accurately recall his medical history, we must defer to the Commission's assessment that Appellant's testimony was credible.

11

was currently performing and does not establish Appellant could not have worked at a different, less physical job.

Consistent with the medical records and Appellant's testimony, the report and testimony of Appellant's vocational expert, Michael Dreiling, reflect that it was only after Appellant's back surgery that Appellant discontinued doing the heavier physical lifting activities in his work and significantly self-accommodated related to the physical requirements of his work.[8]  Both Dreiling's report and testimony reflect that Appellant was "very physically involved with the business, in terms of doing the ground-level laborer work until he had his back surgery. . . . After that, he primarily tried to stay on the equipment and operated the various types of dozers, backhoes and trackhoes." While Dreiling testified on cross-examination that Appellant was never likely to be able to compete for and obtain employment in a training or supervisory capacity for another company, based on his hearing loss, communication problems, and education, and that Appellant had self-accommodated to allow himself to perform those duties for his own company,[9] Dreiling's opinion that Appellant could not obtain other, non-supervisory employment expressly took into account the restrictions placed upon him as a result of his 2008 back injury and 2009 shoulder injury.  Dreiling's report and testimony do not support a finding that Appellant was unemployable in the open labor market prior to his back injury and its resultant restrictions that he not sit for more than one or two hours at a time and that he lift no more than fifty pounds (ie. that he could not have found

---

[8] The record reflects that, after his first rotator cuff surgery, Appellant had difficulty reaching up with his right arm to pull himself into a couple of larger pieces of heavy equipment and stopped operating those machines himself.  While this was certainly an accommodation of sorts, nothing in the record indicates that he would have been required to operate such machinery in a job with a different employer.

[9] When this questioning occurred, the Fund appears to have been trying to establish that Appellant was not permanently and totally disabled and could have obtained employment in a supervisory and training capacity despite his back and shoulder injuries.

12

employment operating a dump truck, garbage truck, backhoe, or other vehicle full-time or that he could not have primarily sat and performed light industrial or security work).[10]

As several of the factual findings underlying the Commission's decision that Appellant was completely and totally disabled prior to his January 2008 back injury are not supported by substantial and competent evidence, the Commission's decision is reversed, and the cause is remanded for further proceedings consistent with this opinion.

_____
Joseph M. Ellis, Judge

All concur.

---

[10] Dr. Koprivica's testimony reflects his opinion that Appellant was employable prior to 2007, that the residual effects of his hernias were "very minor" in terms of any permanent restrictions placed on Appellant, and that Appellant was not completely and totally disabled until after his final shoulder injury.