

# In the Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| RONALD REYNOLDS, | ) | |
| Respondent, | ) | WD81969 |
| v. | ) | |
| | ) | |
| WILCOX TRUCK LINE, INC., | ) | FILED: September 17, 2019 |
| Appellant. | ) | |

## APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION

### BEFORE DIVISION ONE: VICTOR C. HOWARD, PRESIDING JUDGE, LISA WHITE HARDWICK AND GARY D. WITT, JUDGES

Wilcox Truck Line, Inc. and its insurer Accident Fund Insurance Company of America ("collectively, Employer") appeal the decision of the Labor and Industrial Relations Commission ("Commission") awarding workers' compensation benefits to employee Ronald Reynolds. Employer raises two points on appeal: 1) the Commission's award was erroneous because there was insufficient evidence that Reynolds was permanently and totally disabled as a result of his injury; and 2) the Commission erred in awarding Reynolds's wife ("Wife") compensation for past nursing services because she provided services that would typically be provided by a spouse. For reasons explained herein, we find no error and affirm.

**FACTUAL AND PROCEDURAL HISTORY**[1]

On July 17, 2007, Reynolds was driving his regular route between Tennessee and Iowa as an over-the-road trucker for Wilcox Truck Line, Inc. As he traveled through a construction area on Interstate 35, Reynolds's tractor-trailer made contact with a concrete barrier before crossing over and striking a guardrail and a road sign on the other side of the road. The tractor-trailer overturned and slid against the road on its passenger side until coming to a rest in the middle of the roadway. Reynolds kicked out the windshield to escape the wreckage, as the tractor-trailer caught fire and burned. Reynolds was transported to a hospital but was released later that day with directions to see a local doctor after medical providers determined that, in his extremely agitated state, he was a greater danger to himself within the hospital than at home.

Immediately after Reynolds returned home, he experienced sleep disturbances which Wife described as "[e]very time he closed his eyes to [sleep] he would wake up yelling." Employer directed Reynolds to seek treatment at the local urgent care clinic. Wife conscripted the assistance of her sons to get Reynolds into the family truck because he refused to enter a moving vehicle. After a few examinations by urgent care providers, Reynolds was diagnosed with post-traumatic stress disorder (PTSD) and referred to licensed clinical social worker Anne Heselton for further consultation. Heselton subsequently concluded that Reynolds met the diagnosis criteria for acute stress disorder because:

---

[1] Reynolds contends that the appeal should be dismissed pursuant to Rule 84.04(c) because Employer's brief does not contain a full and fair version of the facts at issue in this appeal. While there are technical deficiencies, we find that Employer's brief substantially complies with the Rule and we are able to address the claims presented. "We will not exercise our discretion to dismiss an appeal for technical deficiency under Rule 84.04 unless the deficiency impedes disposition on the merits." *Emig ex rel. Emig v. Curtis*, 117 S.W.3d 174, 177 (Mo. App. 2003) (internal citation and quotations omitted).

2

he has been exposed to a traumatic event in which he experienced injury and a threat to his physical integrity and his response involved intense fear, helplessness, and horror; he has had some dissociative symptoms; he is persistently reexperiencing the trauma through thoughts and dreams and is distressed when exposed to reminders of the traumatic event; he is avoiding stimuli that arouse recollections of the trauma; he has marked symptoms of anxiety and increased arousal (difficulty sleeping, irritability); the symptoms are causing clinically significant distress; the symptoms have lasted for 9 days and occurred within 4 weeks of the traumatic event; and the symptoms are not due to the direct physiological effects of a substance, a general medical condition, Brief Psychotic Disorder, or another Axis I or Axis II disorder.

In September 2007, Dr. Elizabeth Bhargava became Reynolds's treating psychiatrist. Upon diagnosing Reynolds with PTSD, she increased his Prozac dosage and prescribed another medication to assist with his continued sleep disturbances. She referred him to a neuropsychologist, Dr. Steven Akeson for further therapy in October 2007. Dr. Akeson noted improvement after a few sessions and reported Reynolds was "very motivated to return to work[,]" and that his prognosis was excellent despite recent episodes of depression and anxiety. Dr. Bhargava subsequently cleared Reynolds for a trial period of over-the-road truck driving as long as he carefully monitored the effects of his prescribed sleep aid and kept his driving to the daylight hours. In therapy progress notes, Dr. Akeson outlined a potential return plan that would start with co-driver trips to Memphis and progress to occasional, unassisted trips before a full return to duty at some point in May 2008.

Upon his return to work, Reynolds reported that his confidence increased with each trip made with a co-driver. He noted some symptoms of anxiety when crossing through construction zones but was able to manage the symptoms. Reynolds eventually began driving solo trips to Memphis, which continued until April 27, 2008. On that day, Reynolds called his Wife after witnessing a "bad accident" on the road.

3

Reynolds said he was sorry that he didn't stop but the accident involved a family and he just "had to get on around it[.]"  He asked Wife to pick him up at his truck drop-off location at 5:00 p.m.

Wife was unable to get Reynolds to exit the truck or unlock the cab door when he arrived at the drop-off location.  She went to the passenger side and eventually convinced Reynolds to unlock the driver's side door.  However, Reynolds refused to get out of the truck and had to be physically removed by Wife with the assistance of another trucker.  Reynolds has not returned to work since this incident.

On November 8, 2008, Dr. Dale Halfaker, a neuropsychologist, conducted an evaluation of Reynolds based on DAPS[2] testing and a review of his medical records.  Dr. Halfaker diagnosed Reynolds with PTSD and rated its effect as a permanent 10% partial disability.  Further, Dr. Halfaker opined that Reynolds had reached a maximum level of psychological improvement and that he could return to work without psychological restrictions.

On November 11, 2010, Dr. Stanley Butts evaluated Reynolds at the request of Reynolds's counsel.  Dr. Butts diagnosed Reynolds with PTSD and major depressive disorder resulting from the 2007 tractor-trailer accident.  He rated Reynolds as permanently and totally disabled, noting specifically that he was unable to engage in meaningful, gainful employment as a result of the PTSD.  Dr. Butts recommended continued use of medication and therapy.

Reynolds also engaged Gary Weimholt, a vocational rehabilitation consultant, to perform a vocational evaluation based upon review of medical records, letters and notes

---

[2] DAPS is a 104-item comprehensive clinical test for "Detailed Assessment of Post-Traumatic Stress."

4

completed by Wife, and deposition testimony. Weimholt opined that Reynolds would not be able to return to employment as a truck driver. Further, Weimholt concluded that no employer would hire Reynolds because of "the mental health problems that he has associated with [PTSD] that have been documented in the file."

Dr. Jennifer Lynch of the Ferell-Duncan Clinic conducted an Employer-requested mental examination of Reynolds on July 24, 2015. Dr. Lynch's diagnoses were REM sleep behavior disorder, depression, chronic insomnia, and PTSD. Dr. Lynch found no evidence of progressive cognitive decline but recognized that Reynolds was clearly suffering from impaired cognition and symptoms consistent with PTSD and depression. Dr. Lynch observed that previous evaluations had reported a significant decline from prior to the accident. Accordingly, Dr. Lynch recommended continuing the present care plan but suggested a few modifications to Reynolds's medication regimen.

The Commission heard testimony about Reynolds's declining mental and physical abilities after the accident. Prior to his injury, family members described him as a sharp man who was good with numbers and proficient at maintaining vehicles and other farming implements. Further, he raised over a hundred head of cattle and hogs as well as six horses. Post-injury, he was unable to work as efficiently, needing both constant supervision and far more time to complete even simple activities.

On March 23, 2011, Reynolds requested nursing services related to his injuries, but Employer refused to provide the services. Wife initially reduced her work hours outside the home to care for Reynolds. Based on Reynolds's declining condition, Wife eventually abandoned her outside employment entirely to care for him. Victoria Powell,

5

a nurse and care consultant, concluded that Reynolds needed sixteen to twenty hours of daily home care for "maintenance, safety, and well-being."

Reynolds sought workers' compensation for his injuries. Following a final hearing, the Administrative Law Judge ("ALJ") determined that, as of November 20, 2014, Reynolds was permanently and totally disabled because of his work-related PTSD and depression. The ALJ denied Reynolds's request for past nursing services performed by Wife, determining that "[Wife] does not provide constant care for [Reynolds]," and that "the services she provides to [Reynolds] are primarily services ordinarily provided by a wife to a husband." Both parties requested the Commission to review the award. The Commission subsequently affirmed the finding of permanent and total disability, but partially reversed the ALJ's decision and awarded Reynolds compensation for Wife's past nursing services. Employer appeals.

## STANDARD OF REVIEW

Our review of a workers' compensation award focuses on the decision of the Commission and not that of the ALJ.[3] *Glasco v. Treasurer of State—Custodian of Second Injury Fund*, 534 S.W.3d 391, 397 (Mo. App. 2017). We will not disturb the Commission's award unless the Commission acted in excess of its powers, the award was procured by fraud, the facts found by the Commission do not support the award, or there was not sufficient competent evidence in the record to support the award. §

---

[3] The Commission, in modifying the ALJ's award, stated that the ALJ's findings were "interspersed throughout a 136-page decision that includes lengthy summaries of the evidence . . . without accompanying analysis or commentary from the [ALJ] as to how he viewed such evidence." Based on its reading of *Stegman v. Grand River Reg'l Ambulance*, 274 S.W.3d 529, 533-34 (Mo. App. 2008), the Commission attached and incorporated the ALJ's award but also included in its final award a summary of the ALJ's findings that the Commission affirmed and adopted as its own. Consequently, the Commission's summary and adoptions will guide our review in any circumstance where the two awards differ.

6

287.495.1.[4]  In deciding whether there was sufficient competent and substantial evidence to support the Commission's award, we examine the evidence in the context of the whole record.  *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222-23 (Mo. banc 2003).  "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence."  *Id.* at 223.

The Commission's determinations of law are reviewed *de novo*.  *Lincoln Univ. v. Narens*, 485 S.W.3d 811, 815 (Mo. App. 2016).  We must, however, "defer to the commission's findings on issues of fact, the credibility of the witnesses, and the weight given to conflicting evidence."  *Malam v. State, Dept. of Corrs.*, 492 S.W.3d 926, 928 (Mo. banc 2016).

ANALYSIS

## I. The Award of Permanent and Total Disability is Supported by Substantial and Competent Evidence

In Point I, Employer asserts that the Commission erred, as a matter of law, in finding that Reynolds was permanently and totally disabled as a result of work-related PTSD.  In support of the point relied on, Employer offers several arguments that fall into two categories: (1) allegations of error arising from the Commission's failure to take into account Reynolds's conduct post-accident; and (2) allegations of error arising from the Commission's failure to properly evaluate expert testimony presented by the parties.[5]

---

[4] All statutory citations are to RSMo 2000 as in effect at the time of Franklin's injury, unless otherwise noted.

[5] We note that Employer's point on appeal is multifarious in that it "groups multiple, disparate claims" and thereby fails to comply with Rule 84.04(d).  *Rouse v. Cuvelier,* 363 S.W.3d 406, 419 (Mo. App. 2012). Although such points generally preserve nothing for review and are subject to dismissal, we exercise our discretion to consolidate and address the arguments in two categories.

## A. Allegations of Error Arising from Reynolds's Conduct

Employer argues that the Commission's finding of permanent and total disability was against the overwhelming weight of the evidence based on the following factors: (1) Reynolds returned to work after initially being diagnosed with PTSD; (2) Reynolds continues to perform various farm duties in connection with a cattle-raising operation; (3) Reynolds's inability to operate a truck does not render him incapable of any employment; and (4) Reynolds has not sought any employment outside his farm since April 2008. In citing these factors, Employer's overarching contention is that there was no evidence that Reynolds has been shut out of the entire open labor market.

"Under section 287.020, the term 'total disability' is defined as the inability to return to any employment and not merely . . . inability to return to the employment in which the employee was engaged at the time of the accident." *Scott v. Treasurer of State—Custodian of Second Injury Fund*, 417 S.W.3d 381, 386 (Mo. App 2014) (internal citation and quotations omitted). It is well established that the test for determining whether a claimant is permanently and totally disabled "is whether the worker is able to compete in the open labor market." *Molder v. Mo. State Treasurer*, 342 S.W.3d 406, 411 (Mo. App. 2011) (citing *Treasurer v. Cook*, 323 S.W.3d 105, 110 (Mo. App. 2010)). "The ability to compete in the open labor market hinges on whether, in the ordinary course of business, any employer would be reasonably expected to hire the individual given his or her present physical condition." *Archer v. City of Cameron*, 460 S.W.3d 370, 375 (Mo. App. 2015).

Employer's four contentions related to Reynolds's post-accident conduct essentially assert a single allegation—that the Commission failed to adequately

8

consider facts that demonstrate that Reynolds is not permanently and totally disabled. These contentions fail for a multitude of reasons.

First, Employer argues that Reynolds chose to voluntarily retire due to "some psychological difficulties in driving a truck." This contention is rebutted by the Commission's factual and credibility determinations—to which we are bound. *See Malam*, 492 S.W.3d at 928. The Commission relied on evidence from Dr. Butts and Weimholt in determining that Reynolds was unable to compete in the open labor market. The mere fact that Reynolds returned to work for a trial period does not defeat his claim for compensation as "Missouri courts have made clear that the Commission is not prevented from finding that a claimant is permanently and totally disabled simply because he or she holds limited, sporadic and/or highly accommodated employment." *Molder*, 342 S.W.3d at 412.

Second, Employer argues that Reynolds is not permanently and totally disabled because he is engaged in a cattle-raising operation that involves "operating tractors, feeding the livestock, and bush hogging pastures." The record, under even the most charitable of readings, does not support Employer's contention. Reynolds stated that he assisted his son in raising approximately eighteen head of cattle and several companion horses. These activities occasionally required Reynolds to fix a fence or clear a pasture with a bush hog. When pressed, however, Reynolds described his work as "piddling"—a characterization supported by Reynolds's family members, all of whom stated that his capacity for work was limited at best, that he needed to be supervised at nearly every step, and that his diminished capacity often made this farm work a source of grave danger. The Commission adopted the ALJ's "exhaustive" recitation of the

9

testimony from Reynolds's family as competent and substantial evidence supporting Reynolds's contention that he was permanently and totally disability. A claimant need not be completely inert or inactive to qualify as permanently and totally disabled. *Archer*, 460 S.W.3d at 376.

Third, Employer asserts that Reynolds has many talents and a wealth of experience that would allow him to find employment in nearly any field outside "transportation employment." Employer contends that the record demonstrates that Reynolds "has farmed his entire life including cattle raising, has had employment as an auctioneer, has had a business buying and selling cattle, and is mechanically inclined on and off his farm (including motor vehicle repair, welding, and general laborer)." While the record demonstrates that Reynolds has engaged in those practices, the Commission also determined that—since the accident—Reynolds is *no longer capable* of engaging in any of those potential occupations. For that reason, Employer's third argument must fail.

Fourth, Employer alleges that Reynolds has not sought any employment outside his farm since April 2008 and therefore the Commission was not presented with any evidence that Reynolds lacks access to the open market. This contention, however, ignores the wealth of evidence discussed *supra* and Weimholt's report, wherein he stated:

> In conclusion, it is my opinion that [Reynolds] has a total loss of access to the open competitive labor market and is totally vocationally disabled from employment. It is my opinion that there is no reasonable expectation that an employer, in the normal course of business, would hire [Reynolds] for any position, or that he would be able to perform the usual duties of any job that he has been or is qualified to perform.

10

The Commission was free to—and did—find that this evidence credibly demonstrated that Reynolds was permanently and totally disabled. Accordingly, we reject Employer's claim that the Commission's finding of permanent and total disability failed to account for Reynolds's post-accident conduct.

**B. Allegations of Error Arising from Expert Testimony**

In the second group of arguments challenging the award of permanent and total disability, Employer contends that the Commission failed to properly evaluate the parties' expert testimony because: (1) no treating physician or healthcare provider offered an opinion that Reynolds cannot hold employment; (2) Reynolds relied almost exclusively on the opinion of his retained expert, Dr. Butts, to support his claim of permanent total disability; (3) Employer's expert, Dr. Halfaker, was prevented from completing a second examination of Reynolds; and (4) Reynolds failed to prove that any reported cognitive deficits were caused by the accident.

Employer primarily assigns error to the Commission's reliance on Dr. Butt's opinion over that of Dr. Halfaker. These arguments are a thinly disguised invitation to disregard the Commission's assessment of the medical opinions in the record and make our own assessment, which we cannot do. *Dierks v. Kraft Foods*, 471 S.W.3d 726, 733 (Mo. App. 2015). "Where the right to compensation depends upon which of two conflicting medical theories should be accepted, the issue is peculiarly for the Commission's determination." *Id.* (citation and quotations omitted). Indeed, where the evidence "would warrant either of two opposed findings," we are bound by the Commission's decision, "and it is irrelevant that there is supportive evidence for the contrary finding." *Hornbeck v. Spectra Painting, Inc.*, 370 S.W.3d 624, 629 (Mo. banc

11

2012) (citation and quotations omitted).  We therefore find no error in the Commission's decision to accept Dr. Butt's opinion over that of Dr. Halfaker.  *See Dierks*, 471 S.W.3d at 733.

Employer further suggests that Reynolds improperly relied on Dr. Butt's opinion—that additional psychological testing would be harmful—as both a sword to prove his claim of disability and a shield to prevent further testing by Dr. Halfaker.  The ALJ twice found that Reynolds was justified in refusing to comply with Employer's request to submit to a second neurological examination due to credible concerns that further evaluations would be traumatic and endanger him.  Employer has not provided any authority explaining why the ALJ's ruling was made in error or why we should reverse on this ground when it did not raise this issue for Commission review. "An issue appropriate for, but not addressed with the [C]ommission, cannot be litigated on appeal."  *Archer*, 460 S.W.3d at 377 (alteration in original) (citations and quotations omitted).  Point I is denied.

## II. Wife's Services were Compensable Nursing Services Pursuant to Section 287.140.1

In Point II, Employer asserts that the Commission erred in awarding Reynolds compensation for past nursing services related to tasks completed by Wife.  Employer contends Wife provided assistance to Reynolds as a spouse in the usual course of a marriage and her conduct did not qualify as nursing services under Section 287.140.1, which states, in pertinent part:

> In addition to all other compensation paid to the employee under this section, the employee shall receive and the employer shall provide such medical, surgical, chiropractic, and hospital treatment, including nursing, custodial, ambulance and medicines, as may reasonably be required after the injury or disability, to cure and relieve from the effects of the injury.

12

After the administrative hearing, the ALJ ruled that Reynolds was not entitled to compensation for Wife's services because the services provided by Wife were of a nature "ordinarily provided by a wife to a husband." The Commission reversed the ALJ's ruling and awarded Reynolds compensation for past nursing services, finding that the definition of "nursing" under Chapter 287 is broad enough to cover the additional services provided by Wife—even under a strict interpretation of the statute.

In 2005, the General Assembly amended Chapter 287 to require, *inter alia*, that the provisions of the Worker's Compensation Law chapter be construed strictly. § 287.800.1. Prior to 2005, however, we routinely held that, a liberal construction of Section 287.140.1 justified requiring an employer to compensate a spouse for providing nursing services. *See e.g.*, *Daugherty v. City of Monett*, 192 S.W.2d 51, 56-57 (Mo. App. 1946). Courts also cautioned that the compensable services must be beyond those that a spouse would normally offer by virtue of the marital relationship. *See id.; see also Stephens v. Crane Trucking, Inc.*, 446 S.W.2d 772, 781 (Mo. 1969); *Groce v. Pyle*, 315 S.W.2d 482, 491 (Mo. App. 1958). The prefatory question we must answer prior to addressing the merits of Employer's second point therefore is whether, under the strict construction mandate of Section 287.800.1, the holdings of these cases are still in effect.

"Strict construction of a statute requires that the scope of the statute not be extended beyond its literal meaning and that the statute not be unreasonably interpreted." *Snyder v. Consol. Library Dist. No. 3*, 306 S.W.3d 133, 137 (Mo. App. 2010). However, "[t]he rule of strict construction does not mean that the statute shall be construed in a narrow or stingy manner, but it means that everything shall be excluded

13

from its operation which does not clearly come within the scope of the language used." *Young v. Boone Elec. Coop.*, 462 S.W.3d 783, 792 (Mo. App. 2015) (internal citations and quotations omitted). "The clear, plain, obvious or natural import of the language should be used, and the statutes should not be applied to situations or parties not fairly or clearly within its provisions." *Id.* (internal citations and quotations omitted).

The word "nursing" is not defined within Chapter 287. "In the absence of statutory definitions, the plain and ordinary meaning of a term may be derived from a dictionary, and by considering the context of the entire statute in which it appears." *Kader v. Bd. of Regents of Harris-Stowe State Univ.*, 565 S.W.3d 182, 187 (Mo. banc 2019) (citation and quotations omitted). Nursing is defined as: (1) "the profession of a nurse"; and (2) "the varied activities that constitute the duties of a nurse." *Nursing*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1552 (1993). While the dictionary provides several definitions for the term "nurse," those that could plausibly apply in the context of the Worker's Compensation Law are: (1) "a person who looks after or gives advice to another"; and (2) "a person skilled in caring for and waiting on the infirm, the injured, or the sick; [specific]: one especially trained to carry out such duties under the supervision of a physician." *Nurse*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1551 (1993).

With regard to the first definition, if the term "nursing" could be read to include merely looking after someone, then "nursing" would swallow the entirety of Section 287.140.1 and include as compensable many services not contemplated by the legislature. The second definition more directly applies to the provision of medical services for injuries. Therefore, we read "nursing" to mean the varied activities that

14

constitute the duties of a person skilled in caring for and waiting on the infirm, the injured, or the sick; which *could* include one especially trained to carry out such duties under the supervision of a physician. *See id.*; see also *Nursing*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1552 (1993).

"In construing a statute, [we] must presume the legislature was aware of the state of the law at the time of its enactment." *Suffian v. Usher*, 19 S.W.3d 130, 133 (Mo. banc 2000) (quoting *Matter of Nocita*, 914 S.W.2d 358, 359 (Mo. banc 1996)). Consequently, "[u]nless a statute clearly abrogates common law by express statement or by implication, the common law stands." *Ahern v. P & H, LLC*, 254 S.W.3d 129, 133 (Mo. App. 2008). This is particularly true in areas of "traditional judicial activity," where we require the General Assembly to make a "positive expression" of its intent to foreclose our previous actions. *O'Grady v. Brown*, 654 S.W.2d 904, 911 (Mo. banc. 1983) (citation and quotations omitted).

The legislature, in amending Chapter 287, could have chosen to define nursing in any number of ways. See *Nursing*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1552 (1993); *see also Nurse*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1551 (1993). It also could have chosen to abrogate our previous decisions that defined and applied the term. Indeed, the legislature demonstrated that it is perfectly capable of abrogating previous opinions it finds objectionable. *See, e.g.*, § 287.020. Instead, the General Assembly shifted the lens of construction pursuant to Section 287.800.1, without changing the definition of nursing or the focus of Section 287.140.1. Prior to the amendment, the focus of Section 287.140.1 in regard to "nursing" was on the *type of service* rendered, and not on *the individual* rendering the service. Nothing in the

15

General Assembly's statutory amendment has changed that focus. "Statutes are enforced as they are written, not as they might have been written." *Frye v. Levy*, 440 S.W.3d 405, 420 (Mo. banc 2014). Put simply, if the shift towards strict construction made any measure of difference in the definition of nursing, it has resulted in a reduction of the types of services contemplated as "nursing" by the statute and not in the categorical abrogation of a spouse's capacity to provide compensable nursing services. Indeed, neither the text of Section 287.140.1, nor the dictionary-derived definition of nursing indicate that the individual offering the services need licensure or formal education. *See* Section 287.140.1; *see also Nursing*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1552 (1993)

Section 1.120 offers further support for this construction of Section 287.140.1. It provides: "[t]he provisions of any law or statute which is reenacted, amended or revised, so far as they are the same as those of a prior law, shall be construed as a continuation of such law and not as a new enactment." § 1.120. This construction is consistent with the general canon of interpretation that in circumstances where "part of a statute is repealed by an amendatory act, the provisions retained are regarded as a continuation of the former law while those omitted are treated as repealed." *Sell v. Ozarks Med. Ctr.*, 333 S.W.3d 498, 508 (Mo. App. 2011) (internal citation and quotations omitted). As explained by the Missouri Supreme Court:

> [W]here a statute is amended only in part, or as respects only certain isolated and integral sections thereof and the remaining sections or parts of the statute are allowed and left to stand unamended, unchanged, and apparently unaffected by the amendatory act or acts, it is presumed that the Legislature intended the unamended and unchanged sections or parts of the original statute to remain operative and effective, as before the enactment of the amendatory act.

16

*Citizens Bank and Tr. Co. v. Dir. of Revenue*, 639.S.W.2d 833, 835 (Mo. 1982) (alteration in original) (quoting *State ex. rel. Dean v. Daues*, 14 S.W.2d 990, 1002 (Mo. 1929)). Consequently, we must still consider whether Wife's services were beyond those owed to a spouse by virtue of the marital relationship, and in so doing, ascertain whether the Commission's award of past nursing services is supported by competent and substantial evidence.

Employer contends that "[t]he crux of what [Wife] has done for [Reynolds] after the accident consists of providing him emotional support when he is feeling down or depressed." This summation runs contrary to the Commission's factual findings that Wife managed Reynolds's medications and monitored his health for adverse drug reactions, communicated with his caregivers, remained with Reynolds during the day to prevent him from "having accidents or from falling into a psychological crisis," used guided imagery and deep breathing exercises to calm him after panic attacks, and counseled him through "symptoms of withdrawal and avoidance." Further, after Employer denied Reynolds's request for nursing care, it became necessary for Wife to reduce, and eventually abandon, her outside employment to provide the services necessary to care for Reynolds.[6] Wife's services met the "nursing" definition of a person skilled in caring for and waiting on the infirm, the injured, or the sick. Additionally, the Commission found "that each of these services were reasonably required to cure and relieve the effects of [Reynolds's] work injury." Accordingly, the

---

[6] "It might be said in passing that if appellants dislike the idea of compensating claimant for such services when rendered by his wife, they might have exercised their privilege of purchasing them for him in the first instance, from someone in the practical nursing profession." *Stephens*, 446 S.W.2d at 781 (citation and quotations omitted).

17

nursing services provided by Wife are compensable under any reading of Section 287.140.1.

Further, the Commission was careful to distinguish between the hours Wife committed to compensable services and those dedicated to normal spousal activities. In arriving at its award, the Commission stated that Powell credibly testified that Reynolds was in need of care and that it would be exceedingly difficult to determine the exact amount of time a person would spend providing nursing services to Reynolds because his condition waxed and waned in terms of severity on a day-to-day basis. The Commission then determined that it is only during "bad days" that Wife is required to provide nursing services and that the "ratio of good days to bad is rather favorable" with bad days occurring, on average, three times per week. This formulation is consistent with the General Assembly's focus on the nature of the duties and not the person performing them. Therefore, the Commission's award of past nursing services is in accordance with the law of Missouri and is supported by competent and substantial evidence. Point II is denied.

## CONCLUSION

The Commission's award is affirmed.

_____
LISA WHITE HARDWICK, JUDGE

ALL CONCUR.

18